CASE 35—HABEAS CORPUS—OCTOBER 14.

## Ellis v. Jesup and wife.

### APPEAL FROM CHRISTIAN CIRCUIT COURT.

1. CUSTODY OF CHILDREN.—The general rule is that the father is entitled to the custody of his infant children, that right growing out of his obligation to maintain and educate them; and he may obtain their custody by the writ of *habeas corpus* when improperly detained from him.

2. AS TO THE CUSTODY OF CHILDREN, COURTS WILL INVESTIGATE THE CIRCUMSTANCES AND ACT ACCORDING TO SOUND DISCRETION, and should not always interfere and take a child, even under fourteen years of age, from the possession of a third person, and deliver it to the father against its will. Its inclination should be consulted if it is of sufficiently mature age to judge for itself, and will even control the right of the father to its possession and education when the nature of the case appears to warrant it. (2 Kent, 194.)

3. WHERE A FATHER HAS SURRENDERED HIS INFANT CHILD TO A THIRD PERSON to be maintained and educated, and he properly performs those duties, it would seem that the authority of the father over the child ceases and passes to the person standing *in loco parentis.*

4. *A father, whose wife died, gave up his daughter two years old, to his wife's sister to be maintained and educated,* and the child remained with her

without objection on the part of its father until it was thirteen years old, being properly cared for and educated. In this controversy, in which the father seeks to obtain the custody of her, the child was examined privately by the chancellor, and found intelligent and of competent judgment to make a proper choice, and expressed a desire to remain with her aunt.

It is held that the child's choice should control the action of the court.

It was not error for the chancellor to examine the infant privately out of court as to her wishes.

JOHN FELAND, . . . .⎫
WALTER EVANS, . . .⎬ . . . . . . For Appellant,
WINFREE & McCARROLL,⎭ .

CITED

Revised Statutes, 2 Stanton, 136; 1 Ib. 574 to 578.

Schou. Dom. Rel. 333, 336, 337, 339, 412, 343, 342, 242, 243, 414, 415.

Tyler on Infancy & Cov. 274 to 282.

General Statutes, chap. 48, art. 2, sec. 8; art. 1, sec. 3.

Hurd on Habeas Corpus, 527, 528, 40, 42, 43, 461, 462.

Story's Eq. secs. 258, 259, 266.

Holcomb's Intro. Eq. p. 51.

Forsythe on Custody, 10, 37, 56.

2 Bush, 47, Small v. Small.     4 Bush, 213, Lamb v. Lamb.

7 Bush, 46, Landrum v. Farmer.

1 J. J. Mar. 198, Jarman v. Daniel.

1 J. J. Mar. 307, Coffee v. Watt.

9 Richardson Eq. 188–95.

2 Kent, side pages 220 to 227, 193, 205, 203.

2 Leading Ca. Eq. 231 to 238, 254, 263, 274 to 277.

2 Story's Eq. secs. 1341, 1347, a.

1 Halstead Ch'y, 454.          8 Paige Ch'y, 69.

7 J. J. Mar. 377, 592.          7 Dana, 481, 271.

6 Dana, 396, 448.               Litt. Sel. Ca. 306.

3 Litt. 40, Williams v. Williams.

6 Mon. 9, Tevis v. Craig.       1 Halstead Ch. R. 454

7 Mon. 221, Grant v. Tams.

1 Dana, 261, McCauley v. Givens.

7 B. Mon. 90, Gaithers v. Brown.

5 Mon. 388, Walton v. Kindred.

4 Dana, 97, Clarey v. Marshall.

6 Wheat. 126, Thatcher v. Powell.

9 B. Mon. 278, Wilson v. Wilson.

Ellis v. Jesup and wife.

3 Pr. Wms. 152, Hopkins's case.·
5 East. 221.        19 Wend. 16.        1 Harr. 419.
3 Hill, 399.                    2 Russell, 1.
2 Zabriskie, 286.              3 Ala. 756.
2 N. J. 286.                    13 Johnson, 418.
4 Ohio (N. S.) 615.            11 Jurist, 185.
9 Tex. 109.                    27 Miss. 280.
44 N. H. 321.                  30 N. H. 274.
25 Wendell, 73.                16 Pick. 205.
32 Maine, 560.                 34 Comstock, 262.
55 Ill. 280.                   25 Ind. 500.
34 Ind. 168.                   16 Ala. 759.
16 Eng. Law & Eq. 221.
11 Lord Ray, 1310.             4 Ad. & El. 624.
18 Wendell, 637.               4 Humphrey, 523.

LANDES & CLARK,   ⎫
PHELPS & SON,   .  ⎬ . . . . . . . . For Appellees,
              ⎭          CITED

Revised Statutes, 2 Stanton, 136; 1 Stanton, 578, sec. 7.
General Statutes, 653, 502, 506.
Wall. Phil. Rep. 194, Mary Gilkeson v. Jas. Gilkeson.
2 Bro. C. C. 500, Powell v. Cleaver.
3 Parsons on Con. 56, note g.
4 Dana, 137, Howard's adm'r v. Burgen.
8 B. Mon. 423, Bull v. McCrea.
6 Bush, 245, Myles's ex'rs v. Myles.
9 B. Mon. 369, King's ex'rs v. Hanna.
3 Hill, 399, The People v. Mercein.
2 Kent, 10th ed., top pp. 228, 220, 221, 202.
1 Duvall, 169, Adams v. Adams.
1 Bush, 15, McBride v. McBride.
2 Russell's Rep. 1, Wellesby v. Duke of Beaufort.
3 Burrows, 1434.                    3 Mason, 382.
1 P. A. Browne (Penn.), 143.       13 Johns. 417.
6 Rich. 344, Ex parte Schumpert.
7 Hump. (Tenn.) 111, Ward v. Roper.
1 Sandf. 672, The People v. Pillow.
4 Johns. Ch'y, 80, Matter of Woolstoncraft.
14 Law Rep. (Mass.) 269, Pool v. Gott & wife.
10 Pick., Commonwealth v. Hammond.
18 Wend. 637, People v. Chegary.
10 Foster, 274, The State v. Scott & wife.
10 Vesey, Jr. 52, De Manneville v. De Manneville.

CHIEF JUSTICE PETERS DELIVERED THE OPINION OF THE COURT.

This suit in equity was instituted in the court below by George W. Jesup and Susan M., his wife, against Allen W. Ellis and James O. Ellis, on the 24th of January, 1874, and in a very extended petition the following facts are alleged substantially: That in the year 1859 the defendant Allen W. Ellis married the sister of the plaintiff, Susan Jesup; that shortly after his marriage said Ellis, with his wife, removed to the state of Missouri; that on the 14th of August, 1860, Mrs. Ellis gave birth to a daughter, and as a token of the great affection she bore to her sister, Mrs. Susan Jesup, gave to her infant daughter the name of her sister, *"Susan,"* or *"Sudie;"* that Mrs. Ellis survived the birth of the daughter but a short period, and while on her death-bed asked her husband, in the event of her death, to take her infant to Kentucky and give her to her sister whose name she bore; that Ellis promised her he would do so; that after the death of Mrs. Ellis her husband returned to Todd County, Kentucky, where George W. Jesup and his wife Susan resided, told them the sad news of the death of his wife, and the promise he had made her to bring her infant daughter and give her to the aunt, Mrs. Jesup, and said he had not the means to bring his child with him, but if they would furnish him $200 he would have her brought and would give her up to Mrs. Jesup; that upon this communication being made to Jesup and wife, Mrs. Jesup obtained the consent of her husband for her to take the child and to advance the money to have her brought to them; that she did advance the amount required, and the child was brought from Missouri and given up by her father to them, and she has lived with them ever since; that they have raised, maintained, and educated her at great cost, at least $2,000; that since they have had her, her father has not contributed one cent to her support or education, nor has he ever offered to contribute any thing therefor; that the father executed the agreement to give Susan

up to them, and has acquiesced in their having her without complaint, and never expressed a desire to take her from them, to their knowledge, till within a few days before the institution of this suit; that, being childless themselves, and on account of their relationship to Susan, the name she bears, the manner she was given to them, and the promise made by her father that they should keep her, they have learned to love her as their own, and that she has the affection for them that a devoted child has for its parents, and that a disruption of these relations would bring the deepest sorrow to the parties, and work great injustice to the child; that they have ample means to support her, and have her raised and educated in a style quite equal to the social position of her family; that it is their pleasure to have her, to educate her, contribute all they can to her happiness, and to provide for her in the future according to her expectations induced by the manner in which she has been supported, and that they are the proper persons to have her; that although her father has lived for the last ten or twelve years in the adjoining county of Christian, not more than twelve or fifteen miles from their residence, and privileged to visit her when and as often as he pleased, and always kindly received by the plaintiffs, he rarely came to see her.

They allege that Susan's father has married a second wife, has quite a family of children, is a man of limited means, and to improve his fortune and to lighten the burden of supporting his family he was then about to remove to Colorado, and his purpose is to take Susan with him; that he is wholly unable to support her in the social position in which they have placed her, and to provide for her according to her expectations created by their care and expenditures.

That a small interest in some real estate situate in Christian County came to Susan by descent; the estate was not susceptible of division among those entitled to it; that a sale of it was desirable and necessary, and to procure a sale it was necessary

that a statutory guardian should be appointed for Susan; that on the 25th of April, 1868, her father appeared in the Christian County Court and recommended the appointment of John L. Brame, the maternal uncle of his daughter, waiving the position himself; Brame was appointed, and is now her statutory guardian, and he not only has assented to, but is desirous that the plaintiffs may retain the custody and management of Susan.

That said A. W. Ellis has recently sued out two writs of *habeas corpus* for the purpose of obtaining the possession of Susan, the first one to Todd County, to compel the plaintiff G. W. Jesup to deliver her up, that was dismissed by the judge; the other was granted by James O. Ellis, brother of defendant A. W. Ellis, and judge of the Christian County Court, but made returnable before Thomas E. Lawson and K. Twyman, two justices of the peace for said county. On the trial before them the writ was dismissed.

They allege, on the same day, and immediately after the last-named writ was dismissed, the said James O. Ellis, presiding judge of the Christian County Court, at the request of said Allen W. Ellis, and to aid him to get possession of Susan Ellis, and to remove her out of the state of Kentucky, professing to act in the capacity of a county court, illegally, and without notice to said John L. Brame, caused to be entered on the order book of said court a writing purporting to remove said Brame as guardian of Susan Ellis, and that, confederating together, it is the purpose of said Allen W. and James O. Ellis to seize said Susan Ellis and remove her out of the jurisdiction of the court and from the state of Kentucky against her will, and to the great distress and grief of the plaintiffs and the said Susan.

They therefore pray that the defendants, the said Ellises and all others, be restrained from taking the child Susan Ellis into their possession or into the possession of either of them,

and from removing her from the county of Todd, and that on final hearing they be perpetually enjoined from interfering with her in any way whatever.

Allen W. Ellis, in his answer, admits his marriage with the sister of Mrs. Susan Jesup, their removal to Missouri, and the death of his wife, leaving the daughter, whose name he avers is "*Mary Sue,*" but he denies that he made the promise to his wife on her death-bed, or at any other time, to give his said daughter to Mrs. Susan Jesup, and he denies that on his return to Kentucky after the death of his wife, he stated to plaintiffs he had promised to give the child to them. He says he did not then have the means nor the inclination to bring his child to Kentucky; that he had left her with his brother and co-defendant, James O. Ellis, and his wife, who were then living in Missouri, and were able and anxious to keep her. He admits that the plaintiffs urged him to bring his daughter to Kentucky, and that he agreed with them that if they would furnish the necessary means he would send for her, and give her up to them until he should desire to take her; that he had sisters of his own who were anxious to adopt his child, and who were able to provide for her, and give her a first-class collegiate education, but that he yielded to the urgent entreaties of Mrs. Susan Jesup, and permitted her to take his child for the time being, not solely to gratify her and her husband, but to have her nearer to him than she would be in Missouri, and being unmarried and without any permanent home he could not properly care for her, and therefore permitted Mrs. Jesup to take her temporarily and care for her until he should choose to take her into his own custody; this he says he did, although his own sister offered to take her and make of her an educated and accomplished woman, much more than Mrs. Jesup has offered to do.

He denies that he ever contracted or agreed with the plaintiffs, or either of them, or with any other person, that Mrs. Susan

Jesup should take his child as her own, or that she ever did so take her, and especially does he deny that he ever entered into a contract by which he sold and bargained off his child for a pecuniary consideration, or that he ever entered into any agreement by which he surrendered his right to the custody, care, and education of her, and his parental authority over her.

He admits that he has not remunerated plaintiffs for the expenditures they have made in the nurture and education of his child, and says he did not offer to do so because he did not believe they desired or expected him to do it; but that in all his visits to her, which he says were frequent, he never by act or word intimated that he had surrendered or intended to surrender any of his parental rights over his child; that after his second marriage he frequently took her to his house; that she always appeared glad to visit him, his brothers, and sisters, and always left with reluctance. He says he is able to support and educate her in a style suitable to her social position, and offered at his own expense to send her to the female college at Hopkinsville, but plaintiffs objected, and insisted on sending her to a country school.

He charges that while plaintiffs have the ability to educate her and support her in handsome style they have never adopted her as their own, and have taken no steps to enable her to claim as a right any benefits from their ample means.

He denies the charge that he had never expressed to plaintiffs a wish to have his daughter, and says that some months before this controversy arose he addressed them a letter in which he requested them to surrender her to him and explained fully his reasons for the demand, and they did not then, and never did deny his right until a few days before they instituted this suit.

He admits that Brame was appointed guardian as alleged, and that he waived his right to the appointment, but says it

was made for the special purpose of procuring the sale of the land mentioned, and when that was done the object of the appointment was accomplished, the powers of Brame as guardian should cease, and that none of the parties believed that by virtue of said appointment he surrendered his right to the custody of his child, or that Brame was thereby invested with the right to take the custody and control of her; and he insists, that the Christian County Court had no jurisdiction of the case, and that the appointment was void; and on that account he applied to the court that made the order to set it aside, which the court did, and from which Brame has appealed, and the legality of all the proceedings he supposes will be judicially investigated.

He admits he intends to remove to Colorado, but denies that he is going there to enable him to support his family, or as an experiment; he avers he has always been able to support them comfortably, and is going there in the hope that he may be able to improve his fortune, but that his main object in going is to improve his health, which is not good.

He admits he sued out the writs of *habeas corpus*, as stated in the petition, and then at great length explains why they were dismissed, which is not material to this investigation; he alleges that the plaintiffs and their associates are endeavoring to convince his child that he and his wife are her enemies, and to alienate her affections from them; and while he has all the motives of a father to promote the prosperity and happiness of his child, the plaintiff, Geo. W. Jesup, has none such; that he has never manifested any interest in the child, and has never taken any control or supervision over her, and that his wife, Susan M. Jesup, is not a suitable person to intrust the character and education of a young and motherless girl with; that he never had any doubts on this subject until very recently, and his apprehensions on the subject of her fitness to train his daughter form a powerful motive with him for removing her

to his own home and from the custody of her aunt, against whose character he has heard very damaging rumors.

He denies that he has combined with his brother or any one else to do an unlawful act, denies that he intends to act wrong in the premises, and insists that he has been actuated in this whole affair to get the custody and control of his child, which, as he asserts, are his lawful rights.

James O. Ellis denies any complicity in the matter, and asserts that he has done nothing that he was not required by duty to do.

With the pleadings thus made up the case was finally heard, and the court below adjudged that the plaintiff, Susan M. Jesup, have the care, custody, control, nurture, and education of the infant Sue Ellis until the further order of the court, and that the defendant Allen W. Ellis be perpetually enjoined from interfering with the custody of said Susan M. Jesup of the said Sue Ellis, and that plaintiffs recover their costs of the said Allen W. Ellis, and that the injunction be dissolved and the petition be dismissed as to James O. Ellis, and that he recover his costs from George W. Jesup; and from that judgment Allen W. Ellis has appealed.

It is stated in the opinion of the court below that in response to a rule upon appellees they brought the infant, Sue Ellis, into court, and by the *consent of the parties* said infant was examined by the court privately, and in her statements then made to the judge, she expressed her unwillingness to go with her father (the appellant) and be separated from her aunt, Susan M. Jesup, but desired to remain with Mrs. Jesup; and the judge states in his opinion that she had attained to years of discretion sufficient to enable her to make an intelligent and prudent choice, and his conclusions were based upon the statements of the infant herself and the evidence in the case.

But it appears from the bill of exceptions that the judge had been invited by the counsel of appellees during the argu-

ment of the case to call and see Sue Ellis, but he declined to do so unless the counsel for appellant would consent. They gave their consent; but in doing so they did not intend to consent that the statements made to him by the infant should be evidence in the case, nor did they agree that her statements as to her desires should have any weight with the court on the trial of the case. The statements made by the infant to the judge were made out of court, and not in the presence of appellant and his counsel. And appellant objected and excepted to the action of the court in incorporating in the judgment the wishes of said infant expressed to the judge and what he states in his opinion concerning her ability to make a discreet choice.

The propriety of the privy examination of Mary S. Ellis, the infant, by the judge, and the effect which should be given to her statements and wishes, will be hereafter considered.

The general rule is that the father is entitled to the custody of his infant children, and that right grows out of the obligation the father is under as their natural protector to maintain and educate them during their minority, and he may obtain their custody by the writ of *habeas corpus* when they are improperly detained from him.

But, says Chancellor Kent, the courts of both law and equity will investigate the circumstances and act according to sound discretion, and will not always and of course interfere on *habeas corpus* and take a child, though under fourteen years of age, from the possession of a third person and deliver it over to the father against the will of the child. They will consult the inclination of an infant, if it be of a sufficiently mature age to judge for itself, and even control the right of the father to the possession and education of his child when the nature of the case appears to warrant it. (Kent's Com. vol. 2, p. 194.)

The authority of the parent over his infant child is derived from the duty he is under to protect, maintain, and educate it, and is given partly to enable him the more effectually to per-

form his duty, and partly as a recompense to him for his care and trouble in the faithful discharge of those duties. (2 Blackstone's Com. 452.)

If the authority of the father over his infant child arises from these considerations, it would seem when the father had surrendered his infant child to a third person to discharge these natural duties for it, and such third person had actually performed them, that the authority of the father over the child would cease and pass to the person standing in *loco parentis*.

There is some conflict in the evidence in the case before us, whether appellant made an absolute surrender of the care and control of his infant daughter, Mary Susan, to the appellee, Mrs. Jesup, or not. But the fact is not controverted that Mary Susan was by the direction of appellant brought and given up to Mrs. Jesup before she was two years old; that she has remained with her ever since; that she has been during the whole time tenderly cared for, maintained, and advanced in her education as much as the state of her health would allow; all of which has been done without the expenditure of one cent on the part of her father, the whole having been borne by appellees; and it is in evidence that the affection on the part of the appellees for the child, and on her part for them, is almost, if not quite, as strong as that which usually exists between parents and children. It furthermore appears that appellees are abundantly able to provide for the comfort and to educate Mary Susan in the best schools in the country, and that they are as willing as they are able to do it.

The question then arises, is the authority of the father paramount to every other consideration, and must the best interests of the child yield to that authority?

We have already seen that courts both of law and equity will exercise a sound discretion, and will not as a matter of course interfere and take a child, though under fourteen years of age, from the possession of a third person and deliver it over

to the father against the will of the child.　And it is the duty of the court to see that the infant is not restrained against her will.

In Rex. v. Delaval (3 Burr, 1434) Lord Mansfield said in cases of writs of *habeas corpus* directed to private persons to bring up infants the court is bound *ex debito justiciæ* to set infants free from any improper restraints; but they are not bound to deliver them over to any body, nor to give them any privilege. This must be left to their discretion, according to the circumstances of the particular case. And in that case the court refused to deliver the infant to her father, but left her at liberty to go where she would.

In Rex v. Smith (2 Str. 982) a boy under fourteen years of age was brought up on *habeas corpus* sued out by the father to obtain possession of him from his aunt, but the court left the boy at liberty to go where he pleased, and he chose to stay with his aunt.

In the matter of Hugh and John McDowle (8 Johns. R. 328), on *habeas corpus* the court declared the infants at liberty to go where they pleased—they might go and put themselves under the protection and care of their father or they might return to the service of their master.

It appears from the note of the reporter that the chief justice asked them where they chose to go, and they answered they wished to return to the master to whom they had been apprenticed, and the court ordered them to be delivered to their master.

In the matter of Jane N. Woolstoncraft an infant, (4 Johns. Ch. R. p. 80), on *habeas corpus* to bring up the body of an infant alleged to have been improperly detained. That was a controversy between the testamentary guardian of the infant and the mother, from whom her father had been divorced, and her brother-in-law, into whose custody the infant had been placed by the mother. The infant was thirteen years of age,

and, being brought up before the chancellor, he examined her touching her situation and wishes. He said the object of the court was to release the infant from all improper restraint, and not to try in this summary way the question of guardianship or to deliver the infant over to the custody of another; that the course of practice of the courts in these cases was only to deliver the party from illegal restraint, and, if competent to form and declare an election, to allow the infant to go where she pleased; and if the infant be too young to form a judgment, then the court is to exercise its judgment for the infant. In support of the doctrine the chancellor cited a number of authorities. After examining the infant, and she appearing to be of competent judgment to make a choice, and electing to remain with her mother and the person with whom she had placed her, she was by the order of the court restored to their custody.

Mary Sue Ellis, at the time of her examination by the circuit judge, was over thirteen years of age, intelligent, and of competent judgment to make a proper choice. That choice should control the action of the court in the matter.

Nor did the judge err in going in person and examining the infant touching her wishes on the subject. Such an examination was necessary to a proper determination of the question before him, and the consent of appellant or his counsel was immaterial.

As to the alleged rumor of any moral delinquency on the part of Mrs. Jesup, the charge is wholly unsustained by the evidence, and it is not improbable was circulated to affect this case. No objection was made in the court to this mode of proceeding to test the right to the custody of the child.

Concurring fully in the conclusions of the court below, the judgment must be affirmed.