UNITED STATES ex rel. SCHNEIDER v. SAUVAGE et ux.

(Circuit Court, W. D. Pennsylvania. January 6, 1899.)

1. HABEAS CORPUS—CUSTODY OF CHILD—DISCRETION OF COURT.
　　In habeas corpus proceedings to recover the custody of an infant, if it is found that such infant is not illegally restrained, the court is not bound to determine who is entitled to its guardianship, nor to deliver it into the custody of any particular person, though it may do so, in its discretion, if of the opinion that, under the circumstances shown, it ought to be done.

2. SAME—WELFARE OF CHILD.
　　In determining the question of the custody of a child, in habeas corpus proceedings, as between a parent and foster parent, the first consideration is the welfare of the child, and the rights of the respective claimants to its custody are secondary.

3. SAME—SURRENDER OF CUSTODY OF CHILD BY PARENT.
　　An unmarried mother in Belgium gave her child, when but a few days old, to her sister, who was married, but without children. When the child was two years old, the sister removed to the United States, and, at the request of the mother, brought the child with her. The mother afterwards married, but never contributed anything to the child's support, nor made any claim to him until he was eight years old. The child had been well cared for by his foster parents, who had become attached to him, as he had to them. They were in fair circumstances. The child was sent to school, and was content to remain with them. Held that, under such circumstances, the court would not, on application of the representa-

tive of the Belgian government, require the foster parents to surrender the child, to be returned to Belgium, to his mother.

Hearing on Writ of Habeas Corpus.

J. S. & E. G. Ferguson and Charles A. Locke, for relator.
Thos. J. Ford, for respondents.

BUFFINGTON, District Judge. On November 18, 1898, Arnold Schneider presented his petition in the circuit court of the United States, setting forth that he was vice consul of his majesty the king of Belgium, and that under section 9 of the treaty concluded the 9th day of March, 1890, between the president of the United States and the king of Belgium, he had a right to address himself to the judicial authorities of the United States for the purpose of protecting the rights and interests of citizens of Belgium; that in pursuance of instructions from his government, and at the instance of Jacques de Koster and Louise Lemaire, his wife, who were subjects of Belgium, residing at Brussels, he prayed the issue of a writ of habeas corpus directing Agathon Sauvage and Maria Lemaire, his wife, residents of Belle Vernon, Fayette county, Pa., to produce the body of Valery Gustav de Koster, an infant child of said Jacques and Louise de Koster, who was alleged to be restrained of his liberty without due process of law. The writ having issued, the child was brought into court upon the day set for hearing, at which time the respondents filed an answer. Therein they admit having in their custody since December 18, 1890, the said child; that he is known as Valery Sauvage; that he was born in a maternity hospital in the city of Mons, Belgium, and was the natural son of Louise Lemaire; that said Louise Lemaire gave the boy to her sister, Maria, when he was 9 days old, and that by her he has been nurtured to the present time; that, about $2\frac{1}{2}$ years after the birth of the child, Louise married Jacques de Koster; that when the child was about 2 years old, and the respondent about to come to America, the mother of the child earnestly requested the respondents to take him with them; that he was brought, and since that time he has been carefully nurtured and cared for, and that respondents, having no children themselves, have acquired a strong affection for him, and he for them; and that he knows no other mother than Maria Sauvage, and prefers to remain with them. At the hearing of the case, testimony was taken by the court, from which it appears that the child was an illegitimate one, and was born in a maternity hospital, as stated in the answer; that at the time Mrs. Sauvage was living in another Belgian city, some distance from Mons; that she went to the hospital and took the child away a few days after he was born, at the express request of the mother, who desired to conceal her misfortune; that a few days thereafter the mother came to Mrs. Sauvage's home and saw the child, and then returned to service, leaving it in her sister's care. The testimony shows further that when Mrs. Sauvage was about to follow her husband to America the mother begged that she take the child with her. The proof is that it has been well taken care of by the Sauvages; that they have no child of their own, and are attached to Valery, and he to them;

that he has been sent to both day and Sunday school; that he has been well clothed, and seemingly well brought up; that Sauvage is a workingman employed at good wages at a glass house, and has acquired property and a home of his own. The child was examined privately by the court, and seemed perfectly content to remain with his foster parents. He is in no way restrained of his liberty. The expense of maintaining the child in Belgium, the bringing of him to America, and the taking care of him since, has been borne solely by the Sauvage family. The certificate of the register of births from the town of Mons was given in evidence, showing that the child was registered as the son of Jacques de Koster and Louise Lemaire, his wife; but it is proper to note that the transcript does not state when such entry was made, and, in view of the proofs made in court, it would seem the child was born out of wedlock.

As no question is raised as to the jurisdiction of this court, we will for present purposes assume this court possesses it; but it will be noted that the jurisdiction here exercised is not that of a court of chancery, where the custody, nurture, or education of one of its wards is involved, but is that of the ordinary common-law or statutory writ, wherein the question is one of illegal restraint. No such restraint being shown in the present case, we would possibly be justified in discharging the writ without further comment. "Although we are bound," says the court in Com. v. Addicks, 5 Bin. 520, "to free the person from all illegal restraints, we are not bound to decide who is entitled to the guardianship, or to deliver infants to the custody of any particular person. But we may, in our discretion, do so, if we think that, under the circumstances of the case, it ought to be done." See, also, Church, Hab. Corp. 439; In re Wollstonecraft, 4 Johns. Ch. 80; In re Waldron, 13 Johns. 417; Lyons v. Blenkin, Jac. 254, footnote (b). In view, however, of the fact that this case is by a foreign government in behalf of one of its citizens, we are of opinion we should detail at length the reasons moving this court in refusing to give the relief here prayed for.

The general trend of the best-considered decisions of our American courts seems to be that when a child of tender years has been surrendered by its parent or parents to the care of another, where the new relationship has been allowed to continue a number of years, and the duty of a parent, in care, in nurture, and in affection, has been faithfully rendered by the foster parents, the courts will not give any active aid to the parent to reclaim the custody of the surrendered child, if convinced that the child will be properly cared for by the foster parents, and the child is content to stay. It will be noted that the first and principal inquiry, the "polestar," as it has been said, by which the courts are guided, is, what is for the best interests of the child? The several rights of the parent and foster parent are secondary to this principal question. That the welfare of the child, rather than the supposed absolute right of the parent, is the end the court seeks, is clear. Thus, in Com. v. Gilkeson, 1 Phila. 194, it is said:

"As the chancellor of the king acts as parens patriæ in such cases, so our courts have considered it their duty to act; looking to the good of the child

so far as they can, and restraining the absoluteness of the parental right when exercised inconsistently with this end."

See, also, Church, Hab. Corp. 446, and cases cited.

In this case the mother voluntarily gave the custody of her new-born child to her sister. It was not a surrender to a stranger, but to one, who by blood, kindred, and her own childlessness, would gladly welcome it with a store of existing affection. The child remained with the sister for two years, through the trying early years of infancy; and, when the sister came to America, the mother begged it should accompany her. For several years thereafter she made no effort to reclaim it. During all these years not one penny was contributed towards its care. These facts are convincing of a purpose on the part of the child's mother to surrender the child to its aunt, and of her consent to its virtual adoption by her. Now, where such facts exist, our courts will not lend their aid to undoing what the parent has done. In Ellis v. Jessup, 11 Bush, 415, it is said:

"The authority of the parent over his infant child is derived from the duty he is under to protect, maintain, and educate it; is given partly to enable him the more effectually to perform his duty, and partly as a recompense to him for his care and trouble in the faithful discharge of those duties. 2 Bl. Comm. 452. If the authority of the father over his infant child arises from these considerations, it would seem, when the father has surrendered his infant child to a third person to discharge those natural duties for it, and such third person has actually performed them, that the authority of the father over the child would cease, and pass to the person standing in loco parentis."

In the present case the parental relation was in effect renounced by the mother, and that renunciation has continued almost from the day of the child's birth, for a period of eight years. Meanwhile the child has left its own country, with the express consent of the mother, and has grown up under different associations and surroundings. It has been well taken care of during these eight years by the foster mother, and it remains within the jurisdiction of this court. If it were remanded to the care of its mother, it would be removed from the jurisdiction of this court; and we are not convinced that it would be as well cared for by its real mother as it has been by the foster one, nor are we convinced that it would be for the best interests of the child that his home should be changed from America to Belgium. The mother of the child, having renounced its care and custody, and having imposed upon her sister the duties of motherhood, which she was unwilling or unable to perform, cannot complain because the law will not now deprive the foster mother of the fruit of her years of unselfish motherhood, to wit, the companionship of her foster child.

Finding as we do that no restraint has been exercised by the respondents, we perform our duty by declining to hand the child over to the consul for removal to Belgium. It is therefore ordered the writ be discharged at the petitioner's cost.