Gail **SYLVANDER et al., Plaintiffs, Appellants,**

v.

**NEW ENGLAND HOME FOR LITTLE WANDERERS, Defendant, Appellee.**

Nos. 78–1081, 78–1082.

United States Court of Appeals, First Circuit.

Argued June 9, 1978.

Decided Sept. 29, 1978.

Lucien Wulsin, Jr., East Boston, Mass., with whom James H. Wexler, Boston, Mass., was on brief, for plaintiffs, appellants.

Robert C. Silver, Boston, Mass., with whom Hale, Sanderson, Byrnes & Morton, Boston, Mass., was on brief, for defendant, appellee.

Before CAMPBELL and BOWNES, Circuit Judges, PETTINE, District Judge.*

LEVIN H. CAMPBELL, Circuit Judge.

Gail Sylvander appeals from a judgment of the district court dismissing both her civil rights complaint brought under 42 U.S.C. § 1983 and her habeas corpus petition brought under 28 U.S.C. §§ 2241 and 2254. Ms. Sylvander sued in the federal district court after the Massachusetts state courts had ruled against her in a dispute over the right of the New England Home for Little Wanderers, a state-licensed, privately-run charitable organization, to place her child for adoption without her consent. *In re New England Home for Little Wanderers,* 367 Mass. 631, 328 N.E.2d 854 (1975). Ms. Sylvander contends that the state statute, Mass.Gen.Laws c. 210, § 3 (1972),[1] un-

---

* Of the District of Rhode Island, sitting by designation.

1. Mass.Gen.Laws c. 210, § 3 provides:

"§ 3. Dispensing with required consent in certain cases; child under care of charitable or public institution; notice of petition

"(a) Whenever a petition for adoption is filed by a person having the care or custody of a child, the consent of the persons named in section two, other than that of the child, shall not be required if:

(i) the person to be adopted is eighteen years of age or older, or if

(ii) the court hearing the petition finds that the allowance of the petition is in the best interests of the child, as defined in paragraph (c).

"(b) The department of public welfare or any licensed child care agency may commence a proceeding, independent of a petition for adoption, in the probate court of Suffolk county or any other county in which said department or agency maintains an office, to dispense with the need for consent of any person named in section two to the adoption of a child in the care or custody of said department or agency. Notice of such proceeding shall be given to such person in a manner prescribed by the court. The court shall issue a decree dispensing with the need for said consent or notice of any petition for adoption of such child subsequently sponsored by said department or agency if it finds that the best interests of the child as defined in paragraph (c) will be served by said degree [sic]. Pending a hearing on the merits of a petition filed under this paragraph,

der which a Massachusetts probate judge decreed that her consent to the child's adoption was unnecessary, is unconstitutional, in that it allows a child to be taken from its natural mother without a showing of parental unfitness if the court finds that it is in the child's "best interests." After the Massachusetts Supreme Judicial Court rejected her arguments under the federal Constitution as well as under Massachusetts law, Ms. Sylvander did not seek review in the United States Supreme Court. She instead brought these proceedings. The district court ruled that the § 1983 complaint was barred by res judicata and that federal habeas corpus jurisdiction did not encompass Ms. Sylvander's custody dispute with the Home. She contends on appeal that the lower court was wrong on both counts.

## I

In the spring of 1972, Gail Sylvander, then about 30 years of age, entered the Crittenton Hastings House, a temporary home for unmarried mothers-to-be after finding that she was pregnant. While awaiting the birth of her child, she discussed possible alternatives for caring for the child with a social worker from the New England Home for Little Wanderers. The Home is not a state agency, but is licensed by the Commonwealth to furnish child-care services. *See* Mass.Gen.Laws c. 28A, §§ 9–16; c. 119, § 23; c. 180. Ms. Sylvander, who was living with her two unmarried brothers and her retired, seventy-year old father, had been told by her father that she could not bring the expected child into the house. Her employment status was uncertain. She appears not to have been financially self-sufficient, having only worked sporadically in factory jobs. On May 12, 1972, she signed a document agreeing to put the child in the temporary charge of the Home for purposes of arranging foster care.[2] On June 28, 1972, Ms. Sylvander bore a son, Michael. She left Crittenton Hastings House several days later, relinquishing Michael to the Home, which placed him with foster parents.

Although Sylvander had previously told the social worker that she planned to put her child up for adoption, a month after his birth she seemed to reverse her previous wish and expressed a desire to keep him. Over the next nine months she made further requests to the Home for Michael's return. At least one request was made through an attorney. This interest was discouraged by the Home on the ground that Sylvander's plans for Michael's care were too confused, vague, and unrealistic for her to assume responsibility for him.[3]

temporary custody may be awarded to the petitioner.

"(*c*) In determining whether the best interests of the child will be served by granting a petition for adoption without requiring certain consent as permitted under paragraph (*a*), the court shall consider the ability, capacity, fitness and readiness of the child's parents or other person named in section two to assume parental responsibility and shall also consider the ability, capacity, fitness and readiness of the petitioners under paragraph (*a*) to assume such responsibilities.

In determining whether the best interests of the child will be served by issuing a decree dispensing with the need of consent as permitted under paragraph (*b*), the court shall consider the ability, capacity, fitness and readiness of the child's parents or other person named in section two of chapter two hundred ten to assume parental responsibility, and shall also consider the plan proposed by the department or other agency initiating the petition.

If said child has been in the care of the department or a licensed child care agency for more than one year, in each case irrespective of incidental communications or visits from his parents or other person named in section two, irrespective of a court decree awarding custody of said child to another and notwithstanding the absence of a court decree ordering said parents or other person to pay for the support of said child there shall be a presumption that the best interests of the child will be served by granting a petition for adoption as permitted under paragraph (*a*) or by issuing a decree dispensing with the need for consent as permitted under paragraph (*b*)."

2. The form petitioner signed stated that the undersigned requests that her child "be placed in foster care, approved and supervised by the [Home]" and that she "understand[s] that [she] continue[s] to have [her] rights and responsibilities as parent of [her] child(ren)."

3. Sylvander suggested that she might move in with a pregnant friend who lived in a three-bedroom apartment with her own three children and was in the midst of marital difficulties.

During the same period, from July 1972 through April 1973, Sylvander made three appointments to visit her son at the foster family but failed to keep any of them. She did make several unheralded visits, however, contrary to the terms of the foster care agreement.[4] During this time her employment status was irregular, although she did maintain weekly payments of $18.00 towards Michael's support.

On April 23, 1973, ten months after Michael's birth, the Home petitioned the Massachusetts Probate Court under Mass.Gen. Laws c. 210, § 3, for authority to dispense with the mother's consent to the child's adoption. Such an order would not obviate the need for a separate adoption proceeding, *In re New England Home for Little Wanderers, supra,* 328 N.E.2d at 857 n.3, but would render a petition for adoption a simple affair. The Home had already selected a young couple (not the foster family) as Michael's proposed adoptive parents. The couple had been married for eight years, had another adopted child, and, in the words of the Supreme Judicial Court, "An investigation of the background of that family had furnished convincing evidence that they were suitable as adoptive parents." *Id.* The Massachusetts statute under which the petition was brought, *see* note 1, *supra* provides that, in the case of a child who is in the care or custody of the Department of Welfare or of a licensed child-care agency, the Department or agency may apply to the probate court for a decree that parental consent to the subsequent adoption of the child be dispensed with. The statute empowers the court to grant the petition and to enter such an order if it finds that the "best interests" of the child will be served thereby. Section 3(c) of the statute directs that,

"In determining whether the best interests of the child will be served by issuing a decree dispensing with the need of consent . . ., the court shall consider the ability, capacity, fitness and readiness of the child's parents . . . to assume parental responsibility, and shall also consider the plan proposed by the department or other agency initiating the petition."

A hearing on the Home's petition to determine compliance with these standards was held in the probate court on February 21, 1974.[5] Sylvander was unemployed at that time, but her father had relented, with some reluctance, on allowing Michael to live in the home where he, his daughter, and the unmarried brothers resided. Her financial plans were unclear—she at one time considered "selling" or raising Burmese kittens to earn money. The probate judge supportably found that Sylvander "took an unrealistic approach to her problems and never worked out a practical way to implement her plans for herself or the child." Concluding that it was "in the best interest of Michael . . . that he be placed with the prospective adoptive parents," the court ruled that consent would not be required upon a petition for adoption.

Sylvander noticed her appeal of the decree to the Massachusetts Appeals Court in March 1974. In October 1974, the Home applied for direct appellate review by the Supreme Judicial Court. On May 5, 1975, the Supreme Judicial Court, having accepted the case for direct review, issued a thoughtful opinion affirming the order of the probate court and upholding the constitutionality of the standards established in § 3.[6] The Supreme Judicial Court also sustained the probate court's actions as a proper interpretation and application of the statute. The court denied that § 3 permit-

---

Sylvander thought vaguely about going on welfare or finding a babysitter and a job in order to support the child.

4. The agreement described in note 2 provided that the parent would discuss all arrangements for visiting her child and any change in plans for her child with her caseworker.

5. The ten-month delay occurred in part because of representational difficulties that beset petitioner. No other reason appears on the record for the hiatus.

6. The present Chief Justice, Justice Hennessey, dissented.

ted a child to be taken from a fit parent solely because of an agency's or judge's view that the child would be better off with another, saying,

> "the tests 'best interests of the child' in the adoption statute and 'unfitness of the parent' in the guardianship statute [Mass. Gen.Laws c. 201 § 5] reflect different degrees of emphasis on the same factors, . . . [T]he tests are not separate and distinct but cognate and connected."

*In re New England Home for Little Wanderers, supra,* 328 N.E.2d at 860. The Massachusetts court said that it did not construe § 3 as permitting a parent to be "deprived unless some affirmative reason is shown for doing so, such as a finding of a serious problem with that parent . . ." *Id.,* 328 N.E.2d at 861. The court went on to emphasize,

> "[W]e do not lend any approval to dispensing with parental consent for other than substantial reasons. . . . G.L. c. 119, § 1 . . . declares it 'to be the policy of this commonwealth to direct its efforts, first, to the strengthening and encouragement of family life for the protection and care of children; to assist and encourage the use by any family of all available resources to this end; and to provide substitute care of children only when the family itself or the resources available to the family are unable to provide the necessary care and protection.' Thus parents should be given ample opportunity to demonstrate an ability to provide proper care for their children before a § 3 proceeding is brought. Precipitate attempts to force adoption over parental objection simply because foster care has occurred are not consistent with the law and must be avoided. It is a condition of dispensing with parental consent that the parents be shown to have grievous shortcomings or handicaps that would put the child's welfare in the family milieu much at hazard."

*Id.,* 328 N.E.2d at 863. So construed, the statute was held to survive constitutional and state law challenge. *Id.* Further, the court felt that Sylvander's consent could properly have been dispensed with under either a "best interests" or an "unfitness" standard. *Id.,* 328 N.E.2d at 862–63. Sylvander's motions for rehearing, which sought to assert substantive due process arguments and to re-emphasize other constitutional claims, were denied. No appeal was taken to the United States Supreme Court, *compare* 28 U.S.C. § 1257(2), and no petition for certiorari was filed.

Four months later, on September 24, 1975, Ms. Sylvander filed this petition for habeas corpus in the district court, joining with it a complaint under § 1983 for relief from enforcement of the order and for a declaration that the statute was unconstitutional. She argued primarily that the decree of the probate court contravened her fourteenth amendment rights to due process and equal protection because it was not premised on a formal finding that she is unfit for parental responsibilities. The district court dismissed the case on December 22, 1977.

## II

We consider first whether or not the district court was correct in ruling that, because Sylvander argued her federal constitutional claim before the Massachusetts courts and received a decision on that issue by the highest court of the state, she is now precluded from pursuing essentially the same claim in the federal district court in a § 1983 action. We affirm the district court's ruling and have little to add to its discussion. *Fortune v. Mulherrin,* 533 F.2d 21 (1st Cir. 1976), *cert. denied,* 429 U.S. 864, 97 S.Ct. 170, 50 L.Ed.2d 143 (1976); *Lovely v. Laliberte,* 498 F.2d 1261 (1st Cir.), *cert. denied,* 419 U.S. 1038, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974); *accord, Red Fox v. Red Fox,* 564 F.2d 361, 363 (9th Cir. 1977); *Spence v. Latting,* 512 F.2d 93 (10th Cir. 1974), *cert. denied,* 423 U.S. 896, 96 S.Ct. 198, 46 L.Ed.2d 129 (1976); *Roy v. Jones,* 484 F.2d 96, 98–99 (3d Cir. 1973).

It is true, as the district court recognized, that appellant's constitutional claim cannot be called frivolous. It is also true that she was an involuntary party in the Massachu-

setts probate court. In somewhat comparable circumstances, some federal courts have refused to apply in a later § 1983 action the sweeping bar of res judicata, which prevents litigation not only of issues actually litigated in a prior proceeding, but also of issues that could have been litigated there. *See New Jersey Education Ass'n v. Burke,* No. 77–1828, 579 F.2d 764, at 771–774 (3d Cir. 1978). This circuit has tended in the other direction, *see Lovely v. Laliberte, supra,* to the satisfaction of at least one commentator, Currie, *Res Judicata: The Neglected Defense,* 45 U.Chi.L.Rev. 332–33 (1978). But the present case does not require us to delve further into that point. Sylvander vigorously argued unconstitutionality before the Supreme Judicial Court and that court ruled on the matter.[7] In these circumstances, even those circuits which eschew the application of broad res judicata principles would consider Sylvander collaterally estopped from repeating her claim of unconstitutionality in the lower federal courts. *New Jersey Education Ass'n v. Burke, supra,* at 774; *Graves v. Olgiati,* 550 F.2d 1327, 1329 (2d Cir. 1977); *see Kurek v. Pleasure Driveway and Park Dist.,* 557 F.2d 580, 594–95 (7th Cir. 1977). *See generally, Developments in the Law— Section 1983 and Federalism,* 90 Harv.L. Rev. 1133, 1330–54 (1977). Under 28 U.S.C. § 1738, federal courts must give full faith and credit to state judgments, and it is axiomatic that state courts are deemed bound to uphold the Constitution with the same vigilance as the federal courts.[8] *Fortune v. Mulherrin, supra,* 533 F.2d at 22; *P I Enterprises v. Cataldo,* 457 F.2d 1012, 1014 (1st Cir. 1972); *see Robb v. Connolly,* 111 U.S. 624, 637, 4 S.Ct. 544, 28 L.Ed. 542 (1884); *Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 341–42, 4 L.Ed. 97 (1816). Here there can surely be no reason to believe that the opinion of the highest court in Massachusetts—written, as it happens, by a former professor of law at Harvard University and one-time reporter for the American Law Institute—is inferior or less sensitive to federal rights than one which members of the federal bench would render.

The reasonableness of barring further proceedings in the lower federal courts is underscored by Sylvander's failure to exercise the federal appellate remedy that was available to her. Besides certiorari, she seemingly had a right of appeal to the Supreme Court. 28 U.S.C. § 1257(2); *Huffman v. Pursue,* 420 U.S. 592, 605, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). The Court would have had to consider the appeal on the merits; even a summary decision would have been binding. *Hicks v. Miranda,* 422 U.S. 332, 344, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). This avenue offered a meaningful

---

7. To be sure, Ms. Sylvander's constitutional argument before the Supreme Judicial Court seems to have stressed the state law's alleged vagueness and its failure to comply with the equal protection clause, whereas now she stresses a substantive due process challenge. *See Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). She raised the latter issue in her rejected petition for rehearing, however, citing *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), and it was at least foreshadowed in her main brief. Certainly the core of her federal claim was put to the state court.

8. Appellant argues that collateral estoppel is inappropriate in cases involving "personal liberty," or at least where habeas corpus relief is unavailable. *Cf. Mastracchio v. Ricci,* 498 F.2d 1257, 1260 n.2 (1st Cir. 1974); *Brown v. Chastain,* 416 F.2d 1012, 1020–22 (5th Cir. 1969) (Rives, J., dissenting); *Pueschel v. Leuba,* 383 F.Supp. 576, 581 (D.Conn.1974). But Congress has carved out no such exception to 28 U.S.C.

§ 1738, and certainly in this case we can perceive no inadequacy in the judicial resources made available to appellant to present her federal claim. Access to four forums, two state and two federal, not to mention her voluntarily forfeited right to seek Supreme Court review, seems beyond anything required to safeguard her legitimate interests.

We add that appellant made no effort during the pendency of state proceedings either to reserve her federal claim for federal court determination or to receive federal court relief. We do not say that either course would have been preferable or even feasible, there being considerable uncertainty in this entire area of overlapping state and federal jurisdiction. *See Cleaver v. Wilcox,* 499 F.2d 940 (9th Cir. 1974); *New Jersey Education Ass'n v. Burke,* No. 77– 1828, 579 F.2d 764 (3d Cir. 1978). But having made no effort to pursue these avenues, appellant is poorly situated to complain that she has been denied a federal forum.

remedy here. Appellant's constitutional claim had been crystallized; it did not require further development in a federal trial court; it was ready for the sort of policy judgment made in the Supreme Court. Judges of the lower federal courts have no special expertise which makes it appropriate to refer the question to them after it has once gone through state channels.[9] As Chief Justice Hennessey's dissent indicates, this is a question on which reasonable men can differ. The final answer is not to be found between the covers of treatises on federal law but requires a judgment as to the ethical, societal and perhaps even religious values at stake in weighing the rights of the natural parents against the putative well-being of the child. These matters having been carefully considered and discussed by the state courts of Massachusetts, there is little reason to relitigate the same issues in yet another set of courts. If constitutional error was committed, the case was as ready as it ever would be for Supreme Court review when the Supreme Judicial Court rendered its decision.

■ We agree with the district court that appellant is precluded from proceeding under § 1983.

### III

■ It was undoubtedly to skirt the estoppel barrier just discussed that Ms. Syl-

vander filed a habeas corpus petition as an alternative to her § 1983 complaint. Prior state adjudication constitutes no bar to habeas. *See Fay v. Noia,* 372 U.S. 391, 422–24, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

In her habeas corpus petition Sylvander seeks an order that the Home return Michael to her.[10] The district court found that Michael, although living with foster parents, remained under the supervision and control of the Home, "a private non-profit agency engaged in child care," and that this was sufficient to constitute "custody" in the Home. 444 F.Supp. at 398. But it concluded that the necessary element of state involvement was lacking, in that Michael's status with the Home "is analogous to the type of parental custody a probate court may decree in divorce proceedings." *Id.* at 399. Citing our decision in *Donnelly v. Donnelly,* 515 F.2d 129 (1st Cir.), *cert. denied,* 423 U.S. 998, 96 S.Ct. 429, 46 L.Ed.2d 373 (1975), the court ruled that custody of this character was not custody of the kind as to which federal habeas corpus relief may be afforded.

The question of the availability of habeas relief in a case such as this is is not an easy one, nor is it one likely to be settled for all time in the circuit courts. There is as yet no ruling on the matter by the Supreme Court, and such authority as exists in the lower federal courts is not definitive.

---

**9.** To the extent that expertise and experience may be implicated, the state courts come out ahead, since federal judges have relatively little experience dealing with family and domestic issues. The probate court judge in this case presumably deals on a daily basis with adoptions, custody cases, guardianships, and the like. *Armstrong v. Armstrong,* 508 F.2d 348, 350 (1st Cir. 1974).

**10.** 28 U.S.C. § 2241(a) empowers district courts, among others, to grant writs of habeas corpus, and in clause (c) goes on to provide in pertinent part as follows:

"(c) The writ of habeas corpus shall not extend to a prisoner unless—
(1) He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or
(2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or

(3) He is in custody in violation of the Constitution or laws or treaties of the United States . . . ."

28 U.S.C. § 2254 provides in part:

"(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

"(b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner."

The arguments favoring application of the federal writ to a child custody case have some initial plausibility. Young Michael is under the supervision of the Home and his status has been endorsed by a state judgment. While he is not a "prisoner" in any usual sense, the word "prisoner" in § 2241(c) clearly does not narrow the availability of the writ to persons in jail only. The writ has been allowed as a remedy for persons restricted by reason of alienage, *Brownell v. Tom We Shung,* 352 U.S. 180, 77 S.Ct. 252, 1 L.Ed.2d 225 (1956); for reservists unwillingly kept in the military, *Strait v. Laird,* 406 U.S. 341, 92 S.Ct. 1633, 32 L.Ed.2d 141 (1972); and for mental patients confined to an asylum, *see King v. McLean Asylum,* 64 F. 331 (1st Cir. 1894); *cf. Arensman v. Brown,* 430 F.2d 190, 194 (7th Cir. 1970) (dictum). Extending the writ to persons accused of crimes who are at liberty on personal recognizance, the Supreme Court said that the "functions of the writ have undergone dramatic change; . . . [H]abeas corpus is not 'a static, narrow, formalistic remedy,' . . . but one which must retain the 'ability to cut through barriers of form and procedural mazes.' . . . 'The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected.'" *Hensley v. Municipal Court,* 411 U.S. 345, 349–50, 93 S.Ct. 1571, 1574, 36 L.Ed.2d 294 (1973) (citations omitted). *See also Jones v. Cunningham,* 371 U.S. 236, 243, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963) (prisoner on parole may avail himself of the writ).

Appellant also gains arguable support from language in *Jones v. Cunningham,* *supra,* 371 U.S. at 238, 83 S.Ct. 373, indicating that in construing the habeas statute reference may be made to the common law and to practices in the states and England. *See id.* at 238–40, 83 S.Ct. 373. Habeas has been used in child custody cases in England and in many of the states. *Id.* at 239–40 & nn. 12, 13, 83 S.Ct. 373, *citing Ford v. Ford,* 371 U.S. 187, 83 S.Ct. 273, 9 L.Ed.2d 240 (1963); *In re Swall,* 36 Nev. 171, 174, 134 P. 96, 97 (1913); *Boardman v. Boardman,* 135 Conn. 124, 138, 62 A.2d 521, 528 (1948). *See also May v. Anderson,* 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953); *Commonwealth v. Briggs,* 33 Mass. 203 (1834); Mass. Gen. Laws c. 248 §§ 1, 35–40.

Finally, the writ has been issued in several child custody cases decided by federal courts, albeit in special and largely distinguishable circumstances. *Nguyen Da Yen v. Kissinger,* 528 F.2d 1194 (9th Cir. 1975); *United States ex rel. Cobell v. Cobell,* 503 F.2d 790 (9th Cir. 1974), *cert. denied,* 421 U.S. 999, 95 S.Ct. 2396, 44 L.Ed.2d 666 (1975); *Application of Reed,* 447 F.2d 814 (3d Cir. 1971). *See also Bell v. Leonard,* 102 U.S.App.D.C. 179, 251 F.2d 890 (1958); *Young v. Minton,* 344 F.Supp. 423 (W.D.Ky. 1972); *United States ex rel. Schneider v. Sauvage,* 91 F. 490 (W.D.Pa.1899). *But see United States ex rel. Reed v. Tinder,* No. 75–1454 (D.W.Va.1975) (unpublished opinion).[11]

But while a case can undoubtedly be made for extending the writ to child custody disputes, the fact remains that over the many years since enactment of the habeas corpus statute in 1867, the Supreme Court has never acknowledged that habeas corpus is an appropriate remedy for litigating fed-

---

11. The children in *Nguyen Da Yen* were in federal custody since they were under the supervisory control of the Immigration and Naturalization Service, having been brought to this country during the so-called "Vietnamese Babylift." *See* 28 U.S.C. § 2241(c)(1). *Application of Reed, Young,* and *Bell* involved child custody disputes arising in the Virgin Islands and in the District of Columbia, where the federal courts were acting as territorial courts. *Cobell* was based on special grant of jurisdiction over claims relating to federal Indian reservations, 25 U.S.C. § 1303, and concerned an Indian child. In *Schneider,* the court denied the writ. It pursued the habeas question at some length only because the couple on whose behalf the vice-consul of Belgium had brought the petition were citizens of Belgium and the child had been born in Belgium. In *Tinder,* a district court did rely on habeas corpus conditionally to require the State Department of Welfare to return a child to its mother, unless the State granted the mother a hearing before entering its final judgment. The opinion was unreported, however, and did not discuss the jurisdictional issue in detail.

eral constitutional claims arising from state child custody disputes. In two child custody cases decided on federal question grounds (but arguably having jurisdictional connotations) the Court refused to authorize the writ. *Matters v. Ryan,* 249 U.S. 375, 39 S.Ct. 315, 63 L.Ed. 654 (1919); *In re Burrus,* 136 U.S. 586, 10 S.Ct. 850, 34 L.Ed. 500 (1890). None of the cases implicating custody rights that have come before the Court reached the Court through the route of federal habeas. The Supreme Court's sweeping language in cases such as *Hensley v. Municipal Court, supra,* 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 141 (1973) and *Jones v. Cunningham, supra,* 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963), concerned extensions of the writ to persons criminally accused who had obvious claim to be treated for federal jurisdictional purposes in the same manner as their incarcerated brethren, even if not confined in the strict sense.

It is of course true that, although the wording of the federal habeas statute is tailored to fit state criminal proceedings, the habeas remedy has been made available in other contexts. What is not clear is that this case presents yet another situation to which that remedy should be extended. Here, the custody that the habeas petition seeks to challenge is a state's assignment of the responsibility for the upbringing of a child to one person or another, in that child's "best interests." Michael is not a detainee or one undergoing some form of state-imposed restraint or disability, but rather is living with persons who have taken interim parental responsibility for him at the request of a private institution after a judicial determination that he may be adopted without parental consent. This is not the kind of custody that has traditionally prompted federal courts to assert their jurisdiction in the face of prior state adjudication. It cannot meaningfully be said that the person in custody—Michael—is being held against his will. The "rights" Ms. Sylvander now asserts on Michael's behalf are chiefly her own—her rights as a mother not to be deprived of her child. Only speculatively are they the rights of the person in "custody." Indeed, several years of state

court litigation resulted in the determination that the Home, a charitable institution established to promote the welfare of children, is correct in arguing that Michael's best interests lie in his being adopted. Thus, if this court were to recognize the availability of federal habeas in child custody cases, the proper party to seek the Great Writ on Michael's behalf in this case might as well be the Home as Ms. Sylvander.

The Supreme Court did indicate in *Jones v. Cunningham, supra,* 371 U.S. at 238, 83 S.Ct. 373, that it may be appropriate to construe the writ in light of its scope in England and in the states, and some of these jurisdictions do use the habeas remedy in child custody proceedings. But the statement in *Jones* was made in the very different context of extending the writ to a paroled prisoner, and we can see no real parallel in child custody matters between state and federal use of the habeas remedy. Federal habeas when applied to persons under state control is a procedure of unique potency within the federal-state framework, having far different and more far-reaching consequences than a state's utilization of habeas within its own system. State utilization of habeas to test the legal custody of a child is part of the fabric of its reserved jurisdiction over child custody matters. If a habeas remedy were not provided, some other procedure would be needed to effectuate the state's substantive interest in these relationships. It is purely a matter of procedural detail whether the remedy is called "habeas" or something else. The federal government, however, has no parallel substantive interest in child custody matters that federal habeas would serve. The sole federal interest is in the constitutional issues collateral to such disputes. At bottom, the question is whether these constitutional issues can be adequately raised through the usual channels—appeal, certiorari and the civil rights statutes—or whether the vehicle of federal habeas, with its unique features, is required. Federal habeas involves a substantial thrust by the federal system into the sphere normally reserved to the states and hence a

change in the federal-state balance. This is so because the federal habeas remedy, as recently fashioned, offers a federal forum regardless of what state proceedings have already taken place and in effect allows a single federal district judge to overrule the judgment of the highest state court, unfettered by the constraints of collateral estoppel and res judicata.

There is little reason to believe that this kind of assertion of federal supremacy is either necessary or appropriate in cases such as this. First, there is a long history of state predominance and federal deferral in family law matters. *Armstrong v. Armstrong,* 508 F.2d 348 (1st Cir. 1974); *Donnelly v. Donnelly, supra,* 515 F.2d 129 (1st Cir.), *cert. denied,* 423 U.S. 998, 96 S.Ct. 429, 46 L.Ed.2d 373 (1975); *see In re Burrus, supra,* 136 U.S. at 593–94, 10 S.Ct. 850. It is by no means clear that the welfare of children and families would be promoted by creating a right to litigate in two sets of courts instead of one, thus extending the potential duration of litigation in this area. Fairness dictates that adequate procedures be available to those unable to agree about such matters, but it is not obvious to us that the interests of children will be served if their welfare and future can be litigated sequentially in both state and federal systems. A convicted prisoner has this opportunity, but may choose to cease litigating whenever it is in his interest to do so. A child, by contrast, has no such control over the litigation in which he is enveloped. He remains in limbo pending a final decision, perhaps unable to find adoptive parents since his availability for adoption is clouded. Moreover, if litigation expenses mount, social workers and charitable organizations such as the Home may well become less willing to seek placements for children over their parents' objections, whether rational or irrational, even though in their honest judgment the child's best interests demand it. In brief, it is questionable that giving disappointed parents the special status of habeas petitioners will necessarily further the liberty interest of the child on whose behalf the petition is nominally brought. We think it both more appropriate and more compassionate to leave the determination of custody to state tribunals, where it has always rested, subject to the normal corrective avenues of appeal and certiorari to the Supreme Court and to such further remedies as may exist under the Civil Rights Act. Nothing in this case suggests that a different approach was needed to give appellant a fair opportunity to raise and litigate her federal claims.

Our point is simply that the considerations in a child welfare case are different from those that are at stake in other cases where federal habeas corpus has been accepted. To hold that relief under §§ 2241 and 2254 is available here would elevate the federal claims made in child custody disputes to the unique status conferred by federal habeas corpus. The result would be to give the mother—whose liberty is not at stake—a preferred position over those championing, as they see it, solely the child's welfare. Unlike a state's application of habeas corpus within its own jurisdiction (or federal application of habeas in cases involving aliens or Indians), the extension of federal habeas has potent implications for federal-state relations.

Appellant argues that we need not be concerned that granting a habeas remedy here will lead the federal courts into all domestic relations squabbles between parents over child custody. Federal courts, she says, could decline garden variety cases by relying on the "domestic relations exception," *see Armstrong v. Armstrong, supra,* 508 F.2d 348 (1st Cir. 1974), which is typically recognized where warring parents seek to proceed under the federal diversity jurisdiction. Only, she says, if the state were taking the child from a "natural" parent would federal habeas be indicated. But we are not clear that this distinction is meaningful. Would disputes between a grandparent and a mother be excluded? Between an adoptive parent and a natural parent? And is it so clear that the Home, a charitable organization without formal custody of Michael but seeking to facilitate his adoption by private parties, should be subject to the writ because it has responsibility

for Michael under a state decree, but that a divorced spouse exercising custody under a state decree should be outside the operation of the writ? We suspect that if habeas were to be allowed in child custody disputes, it would be difficult to limit.

It may also be argued that use of the writ would be a rare thing—that few colorable federal claims arise in these cases and that hence federal courts would be called upon only occasionally, and then only when truly federal disputes (rather than factual disputes most appropriate for resolution by family court judges), were involved. This is not a prediction that we readily accept, however. Family difficulties have, since the time of Solomon, been a major source of dispute and concern in every society. Any attorney or judge familiar with such matters knows the intensity of feeling they generate and the reluctance of a losing party to give up. It seems unlikely that dissatisfied domestic relations litigants would not turn in growing numbers to any new forum made available to them. It is likely, on the other hand, that federal judges, faced with close cases, would be anxious to cure real or fancied injustices. We may expect, therefore, that if this door were opened, the federal courts would be undertaking a substantial new area of judicial review. Certainly the developments in the field of criminal habeas suggest that this would be likely.

We fear that extending the availability of a federal forum here could be a positive detriment insofar as it makes it more expensive and difficult for public and private agencies to act. As indicated in our discussion of the § 1983 remedy, appellant had a right of appeal to the Supreme Court as well as a right to seek certiorari. She received an opinion written with care and skill from the Massachusetts Supreme Judicial Court. To provide her now with a separate habeas remedy in the district court, and ultimately in this court, would give her an opportunity for further litigation that could only undermine both the state's and—quite likely—the child's interests in achieving resolution of these matters within a reasonable time.

In affirming the district court we do so on the limited ground that child custody rulings by themselves are not sufficient to trigger a federal habeas remedy on behalf of a dissatisfied mother. We of course do not rule that children, and those acting for them, may not seek the writ in proper circumstances. Were Michael incarcerated in a state home, or were there other issues making this truly a struggle for liberty by one imprisoned under the aegis of the state, we might well take a different view. Here, however, the question is who should bring Michael up. We do not think that Michael's mother may avail herself of federal habeas corpus to litigate her right to do so.

*Affirmed.*