**Paul WESTERVILLE, on behalf of his children, Joseph Westerville and Catherine Westerville, Petitioners-Relators,**

v.

**KALAMAZOO COUNTY DEPARTMENT OF SOCIAL SERVICES; Kalamazoo County Probate Court, Juvenile Division; Roger Carr and Sharon Carr, Respondents.**

**No. K 81-60.**

United States District Court, W. D. Michigan, S. D.

Feb. 25, 1982.

John Wilkinson, Kalamazoo, Mich., for petitioners-relators.

Richard Lamb, Kalamazoo, Mich., Guardian Ad Litem.

James R. Durant, Kalamazoo, Mich., for Roger & Sharon Carr.

A. Peter Govorchin, Asst. Atty. Gen., Lansing, Mich., for remaining respondents.

### OPINION

ENSLEN, District Judge.

This case requires the Court to determine whether a Petition for Writ of Habeas Corpus is available for a federal constitutional challenge to Michigan's statutory scheme for involuntarily terminating a parent's

rights in his children.[1] The action presently comes before this Court on Respondent's sundry Motions to Dismiss filed pursuant to Rules 12(b)(1), (2), (6) and (7) of the Federal Rules of Civil Procedure.

The facts giving rise to the instant Petition are detailed in full in the Opinion of Montcalm County Probate Judge Charles W. Simon, Jr., attached to this Opinion as Appendix A, which determined that Petitioner's parental rights be terminated pursuant to M.C.L.A. § 712A.2 *et seq.*; M.S.A. § 27.3178(598.2) *et seq.* At this juncture, some of the relevant circumstances drawn from the factual recital therein are set forth, not to evaluate the merits of Petitioner's constitutional claims, but rather to determine whether these facts constitute an extraordinary case impinging with especial harshness on personal liberty—the hallmark for determining whether the requirement for habeas corpus has been satisfied. *Lehman v. Lycoming County Children's Services Agency*, 648 F.2d 135 (CA 3 1981).

The marriage of Paul and Charlene Westerville produced five children before its dissolution by divorce in 1975. The first child was conceived by Charlene Westerville prior to her marriage to Petitioner and was placed for adoption following the marriage and birth at the insistence of Petitioner. Thereafter, four other children were born to the marriage. Christine Marie Westerville was born on August 4, 1970 and tragically died January 9, 1971 with the cause of death set forth on the death certificate as subdural hematoma, due to, or as a consequence of, injury or fall. It was later established that the infant child's death was proximately caused by the thrashing of Christine against a bathroom stool by her mother during a period of stress. A criminal charge of manslaughter was brought against Charlene Westerville terminating in April, 1971 after she entered a plea of guilty to the offense of child cruelty in Kalamazoo Circuit Court, whereupon Judge Lucien Sweet sentenced Charlene to two and one-half to four years imprisonment in the Detroit House of Corrections.

During this period of incarceration, Joseph Paul Westerville was born at Wayne County General Hospital on July 4, 1972. Shortly after birth, he was removed from the hospital by Petitioner, against the informed recommendation of the hospital staff.[2]

Subsequent to her release from the Detroit House of Corrections, Charlene Westerville gave birth on September 5, 1973 to John Lawrence Westerville, who, at the age of seventeen months was taken on March 30, 1975 to the Emergency Room at Borgess Hospital where the young infant was pronounced dead of bronchial pneumonia. An autopsy performed by Dr. Franklin H. Cox, pathologist, revealed that the young child had been very poorly nourished and physically neglected. Dr. Cox concluded that John had been malnourished for a long period of time which ultimately led to bronchopneumonia. He also noted that John displayed a number of bruises about the body which were unrelated to the cause of death. On cross-examination, Dr. Cox related that while some symptoms of teething, as proposed by Petitioner, would be similar to the last stage of pneumonia, the disease would have manifested itself four to six days prior to death. Judge Simon remarked that there was no demonstration by either parent that they took any action during that

---

1. Petitioner contends that M.C.L.A. §§ 712A.2–712A.21; M.S.A. §§ 27.3178(598.2)–27.3178(598.21) is unconstitutional on its face as being impermissibly vague.

2. Judge Sweet testified at the probate hearing that he became concerned for the welfare of Joseph after Petitioner refused to cooperate with the authorities who were attempting to assist Charlene. For example, Petitioner absolutely forbade examining physicians, psychologists or parole officers to talk to his wife in his absence. Because of this pronounced dominance over Charlene, Judge Sweet "protested most strongly against early parole for Mrs. Westerville and referred the matter of Paul Westerville, having custody of Joseph ... to Protective Services due to his concern for the safety of the child..." Infra, Appendix A at 1099. It was Judge Sweet's most emphatic opinion, notwithstanding the fact that the mother denied it, that Petitioner was either solely responsible or contributed to the death of Christine.

period of time to protect the life of their child.

Thereupon, a petition to terminate the parental rights of Charlene and Paul Westerville was filed by Cicily Cagle of the Kalamazoo Police Department; the Probate Court thereafter removing Joseph Westerville from his parents and placing him in temporary foster care.

The last child of this marriage, Catherine Louise Westerville, was born on April 18, 1975 and was brought to the attention of probate authorities when on June 18, 1975 Petitioner and Charlene Westerville were arrested in the process of breaking and entering Maxine's Restaurant in Vicksburg. The Westervilles later plead guilty to conspiracy to attempt a breaking and entering. After the couple was taken into custody, the infant, pursuant to court order, was placed into temporary custody.

After being advised of the above, Michael den Otter, Director of Children Services for Kalamazoo County, filed on July 14, 1975 a further Petition to Terminate the parental rights of Charlene and Paul Westerville, this time with respect to the infant Catherine. The Petition came before Judge Simon, who, after careful consideration of the aforementioned circumstances wrote with respect to Petitioner:

There is, therefore, no reasonable alternative but to conclude that the deaths of two children in this family, Christine and John, were caused by the abuse and utter neglect of the parents. In the first instance, death resulted from beating the child against a toilet stool, while in the second instance, these parents permitted an eighteen (18) month infant to succumb from the final stages of pneumonia, after several days of symptoms during which the father administered a Valium tranquilizer instead of seeking the necessary medical assistance to preserve the child's life; and further, the medical condition was gravely aggravated by malnutrition for a substantially longer period of time. The Court also finds that the father, Paul Westerville, is a person manifesting a character disorder defined by experts in the field of mental health as passive-aggressive personality, aggressive type. The record in this case establishes a continuing pattern of assaultive and aggressive behavior by Paul Westerville from his mid-teens until the most recent months. He attacked his parents until they sought relief from this Court in his teens and submitted him to treatment at two different mental facilities, which were to no avail. The record reflects that he beat his wife often during their marriage and in September of 1975, he struck his wife with a ballpeen hammer after first beating her about the head and face with his fists as she cowered in a bed. This assault was brought on by his dissatisfaction with her for her failing to be absolutely certain that a police officer he wished to have identified as the one who had caught them in a breaking and entering attempt was the proper one. Paul Westerville later pleaded guilty to assault and battery for the occasion in the District Court.

The Court also finds that after the birth of the last child, Catherine, the parents were apprehended during an attempted breaking and entering of a restaurant in Vicksburg, the same restaurant from which Paul Westerville and his son, Joseph, had been befriended by the owner and had had food provided them during times when he had not sufficient income. The child of only several weeks in age was found in the car used for the attempted breaking and entering in the back seat while the parents perpetrated that crime. The parents later pleaded guilty to conspiracy to commit illegal entry.

The record is also replete with instances wherein Paul Westerville threatened people in the ordinary course of business. He told a food stamp supervisor at the Department of Social Services, for example, that if any worker from that department made a home call at his home, that he would cut them in half with a shotgun before they ever reached the steps, notwithstanding the fact that he was

seeking financial assistance from that agency.

Paul Westerville was also observed striking John at age one year by his sister, with a flat hand to the back and upon the face. In February, 1975, an employee of the Michigan Employment Security Commission office saw the Westervilles with their children in their office and observed that John had numerous bruises on his arms and legs and that Joseph had a black eye. Id., at 1100–1101.

Further testimony reiterated that the Westerville family ate most of their meals in restaurants and that the parents did not live long at any residence but moved a great deal from community to community. The Probate Court concluded that "each of the parents are equally responsible for the immediate cause of death in each of the two children". Id., at 1103, and made the following observation regarding Petitioner:

> I see before me a man who is less than a man in the sense that he, with all of his native ability and intelligence, with a fine education, can victimize a small, passive wife with violent physical abuse and direct such violence to small babies as well. Compare his rearing to that of his wife. Taken into a caring home as an infant adoptee, he had all of the advantages of a good home where he was not locked in cellars and physically abused. He had the opportunity of a good education, including college, and yet, he chose to start abusing those who had given him their love, their resources and their guidance. From early teens, he abused a defenseless mother and later the father. Not being satisfied with the utter disruption of the home, he took Charlene as his wife and brought her to despair as a victim of his sadistic streaks. It would be most comfortable to say that during his period of aggression that Paul Westerville was mentally ill. This would let us, as society, and him as an individual, off the hook, but that is not so. The experts say he is not mentally ill and therefore, he is capable of rational thought and can decide between that which is right and that which is wrong. He consistently chooses violence, which surely is the wrong.

> While Charlene pleaded guilty as a result of the death of Christine, the facts show that Paul Westerville was living in the home at that time and did nothing to prevent that death. The facts show that he was living in the home at the time of the death of John and did absolutely nothing to prevent his death from malnutrition and pneumonia.

> The facts also show that every time Paul Westerville is frustrated in any way, much like a small child, he has violent outbursts in the nature of the traditional tantrums of small children. This man demonstrated this in his teens and continues as late as the past six months when he severely assaulted his victim-wife.

> Here is a man who has a degree in social work and should have an understanding of the family and the care and support that a family needs. He has utterly failed in that responsibility and has, although a rational person, perpetrated the destruction of his wife emotionally and the destruction of two babies.

> To further evaluate this man beggars description and defies my interpretation of human spirit. I can only conclude that he is not and will not be of the substance of which fathers are made. Fathers build—he tears down. Fathers guide their children—he abuses them. Fathers provide food and support—he lets them starve. Fathers love—he hates if frustrated. Id., at 1104–1105.

Judge Simon then declared that to protect Joseph and Catherine Westerville from the parents, who "destroyed two of their brothers and sisters and who would, in . . . (his opinion), . . . destroy them as well", if said children were returned to the parents, he had no choice but to terminate Petitioner and Charlene Westervilles' parental rights. An appeal was taken by the Petitioner to Kalamazoo Circuit Court which was denied by a March 27, 1979 opinion and February 19, 1980 order. Thereafter, leave to appeal was sought from the Michigan Court of Appeals, which was denied on April 24, 1980 "for lack of merit in the grounds present-

ed". Similarly, Petitioner's application for rehearing was denied on May 21, 1980. Leave to appeal was then sought from the Michigan Supreme Court and it too was denied on August 20, 1980, the court stating that it "is not persuaded that the questions presented should be reviewed by this Court". Reconsideration of this August 20, 1980 order was likewise denied on November 19, 1980. Petitioner did not exercise his right of appeal under 28 U.S.C. § 1257 to the United States Supreme Court, nor did he file a Petition for Certiorari. Instead on January 7, 1981, Petitioner filed a "Complaint for Declaratory Judgment, Order to Show Cause, and Temporary Restraining Order" based on 42 U.S.C. § 1983 with this Court. That Complaint was dismissed by Order and Opinion of this Court dated March 25, 1981, wherein it was concluded that the issues raised by said Complaint were *res judicata* as they had already been litigated and addressed in the state courts of Michigan. That same day, Petitioner filed the instant Petition for a Writ of Habeas Corpus.

Petitioner contends that this Court has jurisdiction pursuant to 28 U.S.C. § 2241 to entertain an action by a parent, on behalf of his children, to seek the reinstatement of parental rights and the return of said children. 28 U.S.C. § 2241(a) empowers district courts, among others, to grant writs of habeas corpus, and in clause (c) provides in pertinent part:

(c) The writ of habeas corpus shall not extend to a prisoner unless—

(1) He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or

(2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or

(3) He is in custody in violation of the Constitution or laws or treaties of the United States...

28 U.S.C. § 2254 further provides in part:

(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws of treaties of the United States.

(b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

The question of the availability of habeas relief in a case such as this has not as of yet been addressed by the Supreme Court and the Sixth Circuit has provided limited guidance. In *Huynh Thi Anh v. Levi*, 586 F.2d 625 (CA 6 1978) the court found habeas corpus relief to be inappropriate for reasons of comity and because the Petitioner had not exhausted his state court remedies, the court treating exhaustion as jurisdictional. There, a grandmother sought custody of her grandchildren who were part of the Vietnamese Orphans Babylift. The grandmother claimed that the children were being detained in violation of United States treaties, immigration laws, and the Constitution. The writ was sought after the children's foster parents had instituted adoption proceedings in a Michigan state court. The *Levi* court found habeas corpus to be improper, noting that such disputes have traditionally been thought to be within the province of state courts. The Court went further to emphasize that the issues sought to be raised through habeas were the same issues before the state court and that experience and a sense of fairness indicated that the federal courts were not as well equipped as were state courts to deal with the problem.

Other circuits have considered the instant issue. The question was comprehensively

addressed by the First Circuit in *Sylvander v. New England Home for Little Wanderers*, 584 F.2d 1103 (CA 1 1978). The *Sylvander* court analyzed whether the termination of parental rights meant that children were "in custody" for habeas corpus purposes. The facts of *Sylvander* are similar to those in the case at bar.

Gail Sylvander relinquished custody of her son, Michael, to the New England Home for Little Wanderers, a state licensed, albeit privately run institution. After Mrs. Sylvander rescinded her permission granting the Home the right to put her son up for adoption, that institution petitioned the Massachusetts Probate Court for authority to dispense with the mother's consent to the child's adoption. That court found that it was in the best interests of the child to be placed with prospective adoptive parents. The Supreme Judicial Court of Massachusetts affirmed the order of the probate court and rejected Sylvander's argument that the statute's standards were unconstitutional.

Sylvander did not take an appeal to the United States Supreme Court, nor did she file a petition for certiorari. Instead she filed a petition for habeas corpus in the district court for the District of Massachusetts, joining with it a complaint pursuant to 42 U.S.C. § 1983. The district court dismissed her case, and the First Circuit affirmed.

After concluding that *res judicata* barred the § 1983 action, the First Circuit then held that there was not custody for habeas corpus purposes. It pointed out that the Supreme Court "had never acknowledged that habeas corpus is an appropriate remedy for litigating federal constitutional claims arising from child custody disputes." *Id.* at 1110–1111. The First Circuit wrote:

> It is of course true that, although the wording of the federal habeas statute is tailored to fit state criminal proceedings, the habeas remedy has been made available in other contexts. What is not clear is that this case presents yet another situation to which that remedy should be extended. Here, the custody that the habeas petition seeks to challenge is a state's assignment of the responsibility for the upbringing of a child to one person or another, in that child's 'best interests'. Michael is not a detainee or one undergoing some form of state-imposed restraint or disability, but rather is living with persons who have taken interim paternal responsibility for him at the request of a private institution after a judicial determination that he may be adopted without parental consent. This is not the kind of custody that has traditionally prompted federal courts to assert their jurisdiction in the face of prior state adjudication. It cannot meaningfully be said that the person in custody—Michael—is being held against his will. The 'rights' Ms. Sylvander now asserts on Michael's behalf are chiefly her own—her rights as a mother not to be deprived of her child. *Only speculatively are they the rights of the person in 'custody'.* Indeed, several years of state court litigation resulted in the determination that the Home, a charitable institution established to promote the welfare of children, is correct in arguing that Michael's best interests lie in his being adopted. Thus, if this court were to recognize the availability of federal habeas in child custody cases, the proper party to seek the Great Writ on Michael's behalf in this case might as well be the Home as Ms. Sylvander. *Id.* at 1111. (Emphasis supplied)

The court concluded that: "child custody rulings by themselves are not sufficient to trigger a federal habeas remedy on behalf of a dissatisfied mother . . . (h)ere . . . the question is who should bring Michael up. We do not think that Michael's mother may avail herself of federal habeas corpus to litigate her right to do so". *Id.* at 1113.[3]

**3.** In *Castorr v. Brundage*, docket number K 80–161, the parental rights of William and Mary Lou Castorr were terminated and their child Donald made a temporary ward of the court. The Castorrs challenged the constitutionality of the statutory scheme under which the parental rights of the Castorrs were terminated through *inter alia*, the vehicle of federal

Like Petitioner here, *Sylvander* sought to challenge, by way of habeas corpus, the constitutionality of the Massachusetts adoption statute on the grounds that it allowed the termination of parental rights without a showing of unfitness. As aforementioned, the court denied the petition, noting that child welfare cases are different from other cases in which habeas corpus is a proper remedy.

The Third Circuit, sitting *en banc* in *Lehman, supra,* agreed with the *Sylvander* court and likewise found that habeas corpus was unavailable in child custody cases. There, a lower state court of Pennsylvania involuntarily terminated Mrs. Lehman's parental rights at the insistance of the Commonwealth. The Pennsylvania Supreme Court agreed and the United States Supreme Court denied certiorari. Mrs. Lehman then sought a writ of habeas corpus on the grounds that the pertinent adoption statute was unconstitutional on its face and as it applied to her. The district court dismissed the petition for lack of jurisdiction, and the Third Circuit affirmed.

In his plurality opinion, Judge Garth relied heavily upon the reasoning of *Sylvander* and found that the right sought to be protected was the mother's right to raise her children, *not the children's liberty rights.* The court concluded that "the 'custody' of a foster or adoptive parent over a child is simply not the type of custody that may be challenged through federal habeas." *Id.* at 142. "(C)ustody disputes of the nature addressed here and which essentially involve no more than the question of who shall raise a child to maturity, do not implicate the federal interest in personal liberty sufficiently to warrant the extension of federal habeas corpus." *Id.* at 146. Judge Adams' plurality opinion in no way contradicts this language but goes further and finds neither jurisdiction nor standing present in that case. Chief Judge Seitz thought it error to exercise jurisdiction technically present under the statute.

In *Syrovatka v. Erlich,* 608 F.2d 307 (CA 8 1979), cert. denied 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980), the Eighth Circuit similarly concluded that habeas corpus was inappropriate. The court, however, premised its finding on Nebraska law which did not permit a challenge to an adoption after two years. Additionally, the court noted that the best interests of the children therein were not served by the late collateral attack made by way of habeas corpus.

The Ninth Circuit found that habeas did lie in *Nguyen Da Yen v. Kissinger,* 528 F.2d 1194 (CA 9 1975). There as in *Huynh Thi Anh,* the children were part of the Vietnamese Orphan Babylift. Those children were brought to the United States by federal governmental action and were here on a parole status. It was later established that some of the children were not orphans but in fact had living parents in Vietnam, who possibly, to protect their children from the ravages of the war there, placed said children in a position to be removed from Vietnam. *These children* in *Nguyen Da Yen* brought a class action suit to contest their detention. The court characterized the suit as unique and responsive to a highly unusual operation, noting, while most child custody conflicts would not involve a constitutional violation, because of the government's involvement in the case, habeas jurisdiction was appropriate. Subsequently, in *Tree Top v. Smith,* 577 F.2d 519 (CA 9 1978), the Ninth Circuit found habeas corpus to be an inappropriate remedy for a custody dispute. In *Tree Top* an American Indian mother voluntarily turned over custody of her child to a couple, who later gave the child to another couple. This later couple sought to adopt the child and the mother sought a writ of habeas corpus to regain custody. The district court refused to grant a writ and the Ninth Circuit affirmed noting that special circumstances were required to overcome "the long standing policy of the federal courts to refrain from

habeas corpus. Judge Benjamin F. Gibson in an unpublished opinion noted that the Castorrs were not the proper party to seek a writ of habeas corpus, "that only the person in custo-

dy or his proper representative has standing to seek such a writ." *Id.* at 4, citing *Gusman v. Marrero,* 180 U.S. 81, 21 S.Ct. 293, 45 L.Ed. 436 (1901) and 28 U.S.C. § 2242.

interfering in state court domestic relation disputes". *Id.* at 521. The court affirmed the dismissal of the petition on the alternate grounds of abstention and *res judicata* absent unique circumstances which did not exist as distinguished from *Nguyen Da Yen.*

Most recently, the Fourth Circuit in *Doe v. Doe,* 660 F.2d 101 (1981) held that "federal habeas corpus is unavailable in suits between private parties where the object of the suit is to ascertain the custody of a child, or the right to rear the child". *Id.* at 105. There, John and Jane Doe separated after the birth of their child Jack. Jane Doe entered into a lesbian relationship and in 1975, the couple was divorced, with custody of Jack Doe later being awarded to the father, the child upon the commencement of the separation having lived with the mother. In 1975, John Doe married Ann Smith, who petitioned the Virginia state courts to adopt Jack Doe. The mother contested the adoption proceeding but Ann Smith Doe was allowed to adopt the child anyway, Jane Doe's parental rights being terminated by the court. Jane Doe appealed to the Virginia Supreme Court and during the pendency of the appeal filed a habeas corpus petition with the federal district court for the Western District of Virginia alleging that the detention of her son was unlawful and that the Virginia statutory scheme for involuntarily terminating her parental rights was unconstitutional on its face as being vague and overbroad and as applied to her. The district court stayed further action on the habeas petition pending exhaustion of state court remedies and the respondents thereafter petitioned the Fourth Circuit for a writ of mandamus arguing that the district court was without jurisdiction to entertain a petition for habeas corpus regarding child custody between parents. The court concluded:

Reason [5] and precedent both dictate that in this, a purely custodial case between private parties, that the federal courts not intervene. The policy that the federal courts not entertain the case is so strong that any exercise of jurisdiction by the district court would amount to an exercise of power it does not possess. Prohibition lies for the improper exercise of jurisdiction which may otherwise exist. *Ex Parte Peru,* 318 U.S. 578 [63 S.Ct. 793, 87 L.Ed. 1014] (1943). *Id.* at 106.

---

[5]. Reasons abound which we subscribe to for federal courts not to take habeas jurisdiction in custody disputes between man and wife, or a man and his former wife as is the case here. Among them are that the best interest of the child requires a definitive end to the litigation as quickly as may be. *Lehman,* pp. 143–44, 155; *Sylvander,* p. 1112; see also *Syrovatka,* p. 311. That goal is certainly not realized by permitting collateral habeas attacks on state court judgments. Federal habeas corpus carrying with it the principle, while it may be appropriate in prisoners' cases, of the non-applicability of *res judicata* may result in an endless chain of litigation over child custody. This is illustrated by this case where a definitive adjudication of the validity of the Virginia statute involved may be had by Jane Doe as a matter of right by appeal from any adverse determination of the state court under 28 USC § 1257(2). *Hicks v. Miranda,* 422 U.S. 332 [95 S.Ct. 2281, 45 L.Ed.2d 223] (1975). Thus, the claim on argument of Jane Doe that she had rather have a definitive decision on the merits by the Virginia court than a decision of a federal court has a hollow sound when it is remembered she filed her petition for habeas corpus in the federal court shortly after the writ of error was granted by the Virginia Supreme Court, and that a review of any decision of ours holding the Virginia statute valid might only be reviewed by certiorari under 28 USC § 1254(1), while a Virginia decision upholding the validity of the statute would be decided on appeal under § 1257(2) as we have before pointed out. We reason with *Lehman,* p. 144, that this is a case in which parties fighting over the right to raise a child will fight until there is no other forum in which they may do so.

We also think, agreeably with the reasoning of the *Levi* court, p. 634, that experience and a sense of justice and fairness indicate that the federal courts are not nearly as well equipped as are local state courts to deal with the problems of child custody.

We feel especially that any interference of the district court by way of habeas in the ongoing state proceeding presently pending in the Virginia Supreme Court, deciding the very questions presented to the federal habeas court, is an exercise of power that the federal court does not possess, although, as we have noted, it may technically have jurisdiction under 28 USC § 2254.

Not all of the circuits have found federal habeas to be inappropriate. The Fifth Circuit en banc in *Davis v. Page*, 640 F.2d 599 (CA 5 1981) pet for cert filed sub nom *Chastain v. Davis*, 49 LW 3883 (1981) allowed the issuance of a writ of habeas corpus to stand where a mother's children had been placed in the state's care following a hearing where she was not represented by counsel. Habeas jurisdiction was sustained on the ground that the child involved was held pursuant to a judgment of a state court. In *Rowell v. Oesterle*, 626 F.2d 437 (CA 5 1980), Diane Rowell petitioned for a writ of habeas corpus to gain custody of her two children who were in the custody of her former husband pursuant to court order. The court turned to the threshold issue of jurisdiction and wrote:

> Petitioner urges that her children are detained as the result of constitutionally defective procedures. For this alleged wrong, habeas corpus constitutes a traditional remedy. See *Jones v. Cunningham*, 371 U.S. 236, 239, 83 S.Ct. 373, 375, 9 L.Ed.2d 285 (1963) (dictum); *Sylvander v. New England Home for Little Wanderers*, 584 F.2d 1103, 1110 (1st Cir. 1978). We hold, in consequence, that the district court had subject matter jurisdiction to entertain the petition. *Id.* at 438.

Thus, *Sylvander, Doe, Tree Top* and *Syrovatka*, in suits between private parties, have held that federal habeas corpus is not an available remedy where the object of the suit is to determine child custody. In *Rowell*, the Fifth Circuit held that it is appropriate between private parties. The Ninth

Circuit in *Kissinger* has held that federal habeas is available where the federal government is involved and the Fifth Circuit has similarly held with respect to the involvement of a state government. In *Lehman*, the court held that federal habeas was inappropriate where the state was admittedly involved. Likewise, the *Levi* court so held, the Sixth Circuit stating at 633 one of the reasons why federal habeas was inappropriate:

> . . . strong considerations of *comity* lead federal courts to prevent friction with states and avoid interfering in state proceedings, particularly where the federal questions presented are closely intertwined with issues of strong local interest. (Emphasis supplied)

It appears based on the foregoing that the vast majority of the federal appellate decisions on the instant question have held that federal habeas corpus is unavailable in suits between private parties where the object of the suit is to ascertain the custody of a child, or the right to rear the child.

The Supreme Court has long held that the federal courts have no jurisdiction to hear domestic relations matters. *Barber v. Barber*, 62 U.S. (21 How.) 582, 16 L.Ed. 226 (1859). In 1890, the court again noted that "the whole subject of the domestic relations of a husband and wife, parent and child, belong to the laws of the States and not to the laws of the United States". *Ex Parte Burrus*, 136 U.S. 586, 594, 10 S.Ct. 850, 853, 34 L.Ed. 500 (1890); *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581, 99 S.Ct. 802, 808, 59 L.Ed.2d 1 (1979). See also *Tonti v. Petropoulous*, 656 F.2d 212 (CA 6 1981).

While a case can undoubtedly be made for extending the writ to child custody disputes, the fact remains that over the many years since the enactment of the habeas corpus statute in 1867, the Supreme Court has never acknowledged that habeas corpus is an appropriate remedy for litigating federal constitutional claims arising from state

child custody disputes. None of the cases implicating custody rights that have come before the court reached the court through the route of federal habeas. The Supreme Court's sweeping language in cases such as *Hensley v. Municipal Court,* 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973) and *Jones v. Cunningham, supra,* concerned extensions of the writ to persons criminally accused who had an obvious claim to be treated for federal jurisdictional purposes in the same manner as those individuals who were incarcerated. Accordingly, while jurisdiction may arguably exist, the children being held by their adoptive parents pursuant to the judgment of a state court, the question is, as stated in *Sylvander,* who should bring the children up. I am persuaded that the reasons articulated there and in *Doe,* with particular reference to that portion quoted herein, manifest a strong federal policy that federal courts not entertain a case of this nature. Cf. *Levi, supra.*

It is noteworthy that Petitioner had a right of appeal to the Supreme Court as well as a right to seek certiorari. He received an erudite decision written with care from the state court. To provide him now with a separate habeas remedy would undermine both the state's and the children's interests in achieving resolution of these matters within a reasonable time. *Sylvander, supra.* This is not to say that the children, or those acting for them, may not seek the writ in proper circumstances. I do not believe that Petitioner may avail himself of federal habeas corpus to litigate his right to raise his children, that interest having been determined by the state in the exercise of its informed expertise, to lie elsewhere. *Levi, supra.* Respondent's Motions to Dismiss are accordingly, granted.

Appendix A

STATE OF MICHIGAN

THE PROBATE COURT FOR THE COUNTY OF KALAMAZOO

JUVENILE DIVISION

At a session of said Court held in the courtrooms of the Juvenile Court in the County Building, City of Kalamazoo, County of Kalamazoo, on the 9th, 10th, 29th, and 30th days of December, A. D., 1975, the 13th and 26th days of January, A. D., 1976, and the 25th and 26th days of February, A. D., 1976:

PRESENT: HONORABLE CHARLES W. SIMON, JR.    ACTING IN THE
JUDGE OF PROBATE FOR MONTCALM COUNTY   COUNTY OF KALAMAZOO

* * * * * * * * * * * * * * * * * * *
                                    *
In the Matter of:                   *
                                    *
WESTERVILLE:  Joseph Paul           *         FINDING OF FACTS,
              Catherine Louise,     *            OPINION
              a/k/a Christine Louise *              AND
                                    *    ORDER TERMINATING PARENTAL RIGHTS
Minor Children                      *
                                    *
* * * * * * * * * * * * * * * * * * *
File Number  12114

This matter came on to be heard, without jury, December 9, 1975 on the petition of Cicily Cagle, as to Joseph Westerville, born July 4, 1971, alleging,

"is a minor child who comes within the Juvenile Code, Section 2, sub-section (b) Para. I & II; being M.C.L.A. Sec. 712A.2(b); (1) & (2) In that your petitioner alleges upon information and belief that said minor child is a resident of Kalamazoo County and is a neglected child, to-wit: In 1971 a sibling, Christine Westerville, was found dead and the natural mother was found guilty of child cruelty; further on/or about March 30, 1975 a second sibling, John Westerville, died, the cause of death being pneumonia; however, said child had bruises about the body which appeared to be inflicted; further, John Westerville was not seen by a physician just prior to death even though his condition was obvious and visible; further, due to the deaths of both siblings the home and custodial care provided by the parents is unsuitable and Joseph Westerville is in need of protection; further, the natural parents are unable to provide protection and care to which the minor child is entitled; further, said minor child should be made a permanent ward of the Kalamazoo County Probate Court—Juvenile Division and parental rights terminated;"

and on the petition of Michael denOtter as to Catherine Louise Westerville, born April 18, 1975, alleging,

"is a minor child who comes within the Juvenile Code, Section 2, sub-section (b) Para. I & II: In that your petitioner alleges upon information and belief that said minor child is a resident of Kalamazoo County and is a neglected child to-wit: In 1971 a sibling, Christine Westerville, was found dead and the natural mother was found guilty of child cruelty; further, on/or about March 30, 1975 a second sibling, John Westerville, died, the cause of death being pneumonia; however, said child had bruises about the body which appeared to be inflicted; further, John Westerville was not seen by a physician just prior to death even though his condi-

tion was obvious and visible; further, due to the deaths of both siblings, the home and custodial care provided by the parents is unsuitable and Catherine Louise Westerville a/k/a Christine Louise Westerville is in need of protection; further, the natural parents are unable to provide the protection and care to which the minor child is entitled; further, said minor child should be made a permanent ward of the Kalamazoo County Probate Court—Juvenile Division and parental rights terminated."

The two petitions having alleged the same facts and circumstances and the same responding parties being involved, the cases were consolidated for hearing.

James Narregan, Assistant Prosecuting Attorney, appeared for petitioners; James Ryan, Attorney at Law, appeared as Guardian ad Litem for the minor children; Timothy Kragt, Attorney at Law, appeared as counsel for the father, Paul Westerville, and Virginia Davidson, Attorney at Law, appeared as counsel for the mother, Charlene Westerville.

This matter has required several trial days, some forty witnesses have been examined and cross-examined, both lay and expert witnesses, and due to conflicting court schedules for the Court and attorneys, it has been necessary to adjourn from time to time and proofs were closed followed by closing arguments on February 25, 1976.

Due to the seriousness of the relief sought, that is, the termination of parental rights whereby the sanctity of the right of the natural parents of children as against the intrusion of the State in determining the right of custody to serve the best interest of the children involved must be weighed, it is essential that a "finding of facts" be set forth in some detail. The production of numerous exhibits, the testimony of forty or more lay and expert witnesses, has presented to the Court a large body of evidence from which the Court must find the facts by the standard of clear and convincing evidence. After long, deliberate and careful consideration, the Court finds

that the following has been established by clear and convincing evidence.

## FINDING OF FACTS

It has been established by the evidence, and thoroughly uncontroverted, that five (5) children have been born to Paul and Charlene Westerville during the curtellage of their marriage in which a child is acknowledged to have been conceived by Charlene Westerville prior to her marriage to Paul Westerville of whom there was evidence that said child was not the natural child of Paul Westerville. Following the marriage and birth of the child, said child was placed for adoption by the parents, Paul and Charlene Westerville, at the instigation, insistance and demand of the legal father, Paul Westerville, said child having been delivered of the mother during coverture.

There is adequate testimony that Paul Westerville was aware of the pregnancy at the time of the marriage; said marriage having been arranged by the parents of Charlene and Paul Westerville.

The next child born to them was Christine Marie Westerville, born August 4, 1970 and died January 9, 1971 with the cause of death set forth on the death certificate as subdural hematoma, due to, or as a consequence of, injury or fall. Later, in April of 1971, Charlene Westerville entered a plea of guilty to child cruelty before the Honorable Lucien Sweet, Circuit Judge, after said Charlene Westerville had been charged with manslaughter in the death of her daughter, Christine. From all of the testimony, including that of Judge Sweet, the Court infers that such plea was a result of plea negotiation. Mrs. Westerville was thereafter sentenced by Judge Sweet to two and one half (2½) years to four (4) years in the Detroit House of Correction.

Testimony during this hearing indicates that Christine's death was proximately caused by the thrashing of the child against a bathroom stool by the mother during a period of stress, which said evidence has remained uncontroverted.

It is also clear from the testimony that at the time of the sentence by Judge Sweet, Charlene Westerville was again pregnant and during her incarceration, on July 4, 1972, the child Joseph Paul Westerville, was delivered of Charlene Westerville at Wayne County General Hospital. There is evidence that the father, Paul Westerville, went in a couple of days later and removed Joseph Westerville from the hospital against the recommendation of that staff.

There was also testimony that during Mrs. Westerville's early incarceration, Mr. Westerville sought intervention from the Governor's office with regards to his wife's parole and that Dr. Ray E. Helfer, M.D. on the staff of Michigan State University Medical School, as a qualified expert in pediatrics and nationally known for his work in the field of child abuse as a practicing pediatrician and author on the subject of child abuse, was contacted by the Governor's office to assist in the interviewing of Mrs. Westerville and making a recommendation for her early parole. He stated, during his testimony, that Paul Westerville absolutely refused to let him see his wife alone at the Detroit House of Correction and answered almost all of the questions during the interview. This was the first of numerous occasions, according to the testimony, in which the father of these children absolutely forbade the examining physicians, psychologists or parole officers to talk to the mother without the presence of the husband.

It was as a result of the intervention by the Governor's office and Dr. Helfer's interview with Mr. and Mrs. Westerville, that Judge Sweet again entered the matter and protested most strongly against early parole for Mrs. Westerville and referred the matter of Paul Westerville, having custody of Joseph, born while the mother was incarcerated, to Protective Services due to his concern for the safety of the child based on his experience while sitting as Circuit Judge in the matter of the mother's charge of manslaughter, later reduced to child cruelty. It was his most emphatic opinion, notwithstanding, the fact that the mother denied it, that the father was either solely responsible or contributed to the death of Christine, as he testified in this matter. It again should

be noted that the mother absolutely refused to discuss the matter with Judge Sweet's presentence investigator unless the husband, Paul, could be present. The record in this matter shows that Judge Sweet interviewed Mrs. Westerville in chambers before sentence and she refused to discuss how Christine's death was actually incurred although she had earlier pleaded guilty.

Following Charlene's release from the Detroit House of Correction, she gave birth to a child, John Lawrence Westerville, born September 5, 1973, who, at the age of seventeen (17) months, was taken on March 30, 1975, to the Emergency Room at Borgess Hospital where said child was pronounced dead of bronchial pneumonia.

Dr. Franklin H. Cox, pathologist, testified that he performed an autopsy and found the child very poorly nourished and, in his opinion, the child had been physically neglected. His expert opinion was that John had been malnourished for a long period of time which led to broncho-pneumonia.

The exhibits, pictures of the child, also show bruises but Dr. Cox said such bruises did not contribute to death.

On cross-examination, Dr. Cox said that while some symptoms of teething, as proposed by respondent father, would be similar to the last stage of pneumonia, of which the child died, pneumonia would have manifested itself four (4) to six (6) days prior to death and the testimony is void of any action either of the parents took during that period of time to protect the life of their child.

The Court also finds from the evidence that no action was taken by the parents with regards to the pneumonia for a period of at least two days during which the symptoms would have manifested themselves to any reasonable and prudent parent.

The first petition, that of Cicily Cagle of the Kalamazoo Police Department, was thereupon filed with this Court and upon Order of the Court, Joseph was removed from the parents and placed in temporary foster care.

The next and last child of the Westervilles was born April 18, 1975 and the first contact the authorities had with this child was on June 18, 1975 when the Westervilles were arrested in the process of a breaking and entering of Maxine's Restaurant in Vicksburg in the late evening of June 18, 1975 or early morning of June 19, 1975. The child, identified as Catherine, but also known as Christine, was in the vehicle used by the Westervilles during the breaking and entering. Both Mr. and Mrs. Westerville later pleaded guilty to conspiracy of attempted breaking and entering. When the Westervilles were taken into custody, the infant, Catherine, was placed in foster care by Order of the Court.

There is, therefore, no reasonable alternative but to conclude that the deaths of two children in this family, Christine and John, were caused by the abuse and utter neglect of the parents. In the first instance, death resulted from beating the child against a toilet stool, while in the second instance, these parents permitted an eighteen (18) month infant to succumb from the final stages of pneumonia, after several days of symptoms during which the father administered a Valium tranquilizer instead of seeking the necessary medical assistance to preserve the child's life; and further, the medical condition was gravely aggravated by malnutrition for a substantially longer period of time.

The Court also finds that the father, Paul Westerville, is a person manifesting a character disorder defined by experts in the field of mental health as passive-aggressive personality, aggressive type. The record in this case establishes a continuing pattern of assaultive and aggressive behavior by Paul Westerville from his mid-teens until the most recent months. He attacked his parents until they sought relief from this Court in his teens and submitted him to treatment at two different mental facilities, which were to no avail. The record reflects that he beat his wife often during their marriage and in September of 1975, he struck his wife with a ballpeen hammer after first beating her about the head and face with his fists as she cowered in a bed. This

assault was brought on by his dissatisfaction with her for her failing to be absolutely certain that a police officer he wished to have identified as the one who had caught them in a breaking and entering attempt was the proper one.

Paul Westerville later pleaded guilty to assault and battery for the occasion in the District Court.

The Court also finds that after the birth of the last child, Catherine, the parents were apprehended during an attempted breaking and entering of a restaurant in Vicksburg, the same restaurant from which Paul Westerville and his son, Joseph, had been befriended by the owner and had had food provided them during times when he had not sufficient income. The child of only several weeks in age was found in the car used for the attempted breaking and entering in the back seat while the parents perpetrated that crime. The parents later pleaded guilty to conspiracy to commit illegal entry.

The record is also replete with instances wherein Paul Westerville threatened people in the ordinary course of business. He told a food stamp supervisor at the Department of Social Services, for example, that if any worker from that department made a home call at his home, that he would cut them in half with a shot-gun before they ever reached the steps, notwithstanding the fact that he was seeking financial assistance from that agency.

Paul Westerville was also observed striking John at age one year by his sister, with a flat hand to the back and upon the face. In February, 1975, an employee of the Michigan Employment Security Commission office saw the Westervilles with their children in their office and observed that John had numerous bruises on his arms and legs and that Joseph had a black eye.

As to Charlene Westerville, the Court finds that she was one of ten children who were consistently abused by their parents during her formative years. She was confined to a dark cellar for a two or three day period by her father because she was afraid of the dark. There is also testimony that her father often beat her as a child and that when she became pregnant, her parents arranged for her to marry Paul Westerville, although the child she was carrying was not conceived as a result of any relationship between Charlene and Paul.

Expert testimony indicated that Charlene is a passive-aggressive person, of the mostly passive type, but that, however, in times of stress, can become very violent, as witnessed by the death of the first child for which she was convicted and sentenced to the Detroit House of Correction.

It was further established that she became the victim of her husband's physical abuse and was completely dominated by him to the extent that she was absolutely not permitted to talk to consulting physicians, presentencing investigators or parole officers outside the presence of her husband.

Notwithstanding the treatment of her husband, both physically and psychologically, and following the traumatic fact of her incarceration for many months, Charlene returned to her husband upon release and bore him two more children. After her return to him, numerous witnesses testified that Paul did all of the talking for her and refused to let her express herself to any agency or their friends.

The facts indicate that Charlene Westerville has been and would continue, in almost all likelihood, to be completely subservient and be a willing victim for any aggressive person. While there is hope in treatment by experts for her, all indications are that this would require an indefinite but probably long period of time and would depend on her removing herself from association on a regular basis with any dominating personality. Absent such successful treatment, Charlene would continue to act aggressively and violent in times of stress.

Testimony was adduced by both of the parents during this proceeding as to how they cared for their children. Most of the testimony indicated that the Westerville family ate most of their meals in restaurants and that the parents did not live long at any residence but moved around a great deal from community to community.

There is no question that Charlene Westerville was capable of showing affection to her children on occasions when others were about and she was not under stress. The testimony, however, as to the father, while showing that the father usually had his children with him, would sometimes resort to physical force, which some witnesses characterized as discipline too strong, perhaps, but that they felt he cared for his children.

The Court finds, from all of the evidence, that notwithstanding the apparent affection of the parents for the children, they nevertheless killed one child by force and allowed another to die from malnutrition culminating in pneumonia which was left untreated for several days after apparent symptoms of serious illness manifested themselves. The parents in this case, when put together in the social contract of marriage, became utterly destructive and highly damaging force for children unwittingly born to them and subjected to their care and custody.

The Court further finds that the parents are now in the process of divorce and this finding is entered herein only for its probative value as to the effect that this might have on either of the parents as to future ability to properly care for and nuture children to both an emotionally and physically healthy adulthood.

Including this finding of facts, the Court is not unaware that the record is replete with fact after fact which has not been included herein but it is impossible and unnecessary to reiterate all of them here. The Court, in this finding of fact, has set forth what the Court believes to be the substantial criteria for reaching a decision. The testimony of many of the experts will be discussed in the opinion which follows. Likewise, the opinion of the Court may well be based on facts not set forth herein as well as those set forth because many impressions have been formed based on evidence which the Court found both credible and clear and convincing.

## OPINION

The promise of the Juvenile Court, if such there be, is, or should be, justice for the children who come before our Court whether as delinquent or neglected and abused children. Justice for the child reflects a concern of the public that children who may be abused and neglected may be protected and that concern is a relatively new concept in jurisprudence, the Juvenile Codes and Courts having been instituted mostly in this century. Prior to that time, children were little more than chattels of their parents and the public be damned if they protested the parental abuse or neglect as they could use them as they saw fit. When late in the 19th century it was recognized that animals had more protection than children under animal abuse legislation, the social consciousness was stirred to examine into the concept of total parental rights as weighed against the rights of children. It is a result of the inquiry into that concept that brings us here today and has brought all of us here for several days of hard and arduous trial.

The Honorable Lucien Sweet, Circuit Judge, retired, of this County put it most profoundly and succinctly on the witness stand in this very case, and at the risk of badly restating myself, when he said that the only thing which stands between an abused and battered child or a child who may become abused and battered and the parent or parents who do or would abuse and batter that child, is the law. This Court agrees.

No child of tender years is any match for parents who would abuse. No child of tender years knows that he is a victim—he only knows pain. No child of tender years knows that a Court exists for his protection. He is dependent on the police, neighbors, social agencies and rational people to get him that protection. No child knows, and mercifully so, that if some outside source does not get him that protection, that he may well succumb to the vicious and sadistic aggressions of the abusive parent. No child of tender years knows, again mercifully so, that the other parent may well be aware of the abuse but does nothing and

may even aid in the transgressions against the tender young bodies. But a child of tender years knows only one thing, and that is to manifest love and affection to that same abusive parent or parents. The reward for such love and affection by the child in the abusive home is pain, suffering and ultimately even death.

There is no question that termination of parental rights is a very drastic action with far reaching effects on the children involved. Indeed, the question has been litigated and argued before the appellate courts many times in recent years. It has been well settled by the Courts that there is no absolute rights of parents to their children when the parents abuse or neglect their children to the extent that the child's best interest can no longer be served by that relationship and is, in fact, a severe detriment to the child's survival as a healthy child, both physically and emotionally.

As was said by Judge O'Hara in his vigorous dissent in The Matter of Kidder, 50 Mich.App. 204, " . . . . Children have rights as sacred and secure in law as parents. A license to bring children into the world is not a license to abuse them by omission or commission." Judge O'Hara's dissent was later sustained by the Michigan Supreme Court in reversing, or as was said by Justice Cooley in 1880 in a divorce case of *Corrie v. Corrie*, 42 Mich.App. 509, " . . . . In contests of this kind the opinion is now nearly universal that neither of the parties has any rights that can be allowed to seriously militate against the welfare of the child. The paramount consideration is what is really demanded by its (the child's) best interests."

This Court now considers the best interests of Joseph and Catherine Westerville.

At the outset, for this Court to deny that it has been reviled by some of the testimony and exhibits offered in this case would be a total fabrication and a denial of all of the better human instincts that I think we all possess. However, I will hasten to add that I did not become a Juvenile Judge in the State of Michigan to preside over the liquidation of due process in matters involving the termination of parental rights.

At the onset of this case, as in all cases coming before me, I dedicated myself to listening, very carefully, to all of the evidence and to reach no conclusion until the case has been concluded. I submit that my effort in this matter matched my resolve in that regard and I have spent many hours of the last twenty-four hours reviewing some fifty pages of notes that I took, together with the numerous exhibits. I have previously stated my gross finding of facts. While some of the reviling facts were cushioned and softened by subsequent testimony, adduced by the parents, I keep returning to the unalterable and devastating fact that two babies are dead, and dead at the hands of the very parents who brought them life, whether from severe abuse or from severe neglect.

After hearing all of the evidence, I must conclude that each of the parents are equally responsible for the immediate cause of death in each of the two children. Their reasons may be different but death is such a final act that only the cause is important to those two children at this point.

At issue are two living children of the Westervilles and the question is basically and unequivocally: Are those two living children, both presently healthy, to be returned to their parents and can they be guaranteed with reasonable certainty that if returned, they will not come to harm?

There is no question that the death of one child or more in the family is probative and relevant in determining whether other children should be left in the care and custody of the parents. See *In the Matter of: La-Flore*, reported at 210 NW 2d 482.

Thus, if this Court returns Joseph and Catherine to the parents, will they be properly cared for and safe from the destructive forces of the parents who have caused the two deaths some five years apart in time from 1970 to 1975?

What has changed with the parents since 1971? Only more children brought into the world and one of which died within the past year because of severe and utter neglect.

The parents have chosen to say nothing during this entire proceeding, notwithstanding that this was a civil matter and they had no right to remain silent and indeed, could have been called for cross-examination under the statutes. Thus, they have not indicated by one word what efforts they have made to change their situation since last year. There has been, it is true, corollary information that Paul Westerville seeks help at a clinic and that Mrs. Westerville is seeking a divorce and help for her problems but not one witness indicated any progress. Indeed, Paul's therapist had no opinion as to his present condition.

It defies the imagination that these parents, of whom it is represented that they seek so fervently and reverently the return of their children and of whom they claim they deeply love, would not come before the Court and testify to these claims and show the Court a deep and abiding interest and concern in the children.

The Court has no credible idea of how Paul Westerville feels about his children. The Court did discern from her presence during the proceedings, that Charlene Westerville had emotion about her children and was affected by testimony as any mother would and should be during the presentation of horrible and damaging evidence. The Court also discerned that Paul Westerville registers no emotion but appears in demeanor to coldly calculate the effects of such testimony and as though the children discussed were abstract ideas. I believe it is competent for the trier of facts to make such observations of respondents.

I earlier mentioned that the reasons for the actions by these parents might shed some light on how two children died. Let me first consider the mother. I have seen before me in this Court for several days and even now today, a slight, confused, bewildered, beaten young woman whose countenance reflects a lifetime of suffering and misery. Here is a victim of circumstances who could not prevent herself from killing a child in 1970 during a period of severe stress and during a period when she was married to a most destructive and aggressive personality in the nature of Paul Westerville. For a young girl, coming from the home in which she had managed to survive, somehow, she was thrust into a living arrangement with a person who contributed to her violence in times of stress and dominated her rather than a person who could have brought comfort and guidance and tenderness to her in those moments of stress. No, that was not to be, because her parents had seen to that by arranging her marriage for her. The idiom that the abused child becomes an abusive parent was most illustratively demonstrated by that one most regrettable act of Charlene Westerville in 1970. She gave two years or more of her life for them in prison. Where was Paul Westerville during that time? He was free.

Yes, I have a great deal of empathy for Charlene Westerville and I grieve with her for her two dead children and for what must happen here today. All of the victims in this case are not dead. Charlene became a victim at her birth and because society failed to protect her as a child, she remains a vulnerable and pitiable victim today. There is little more that I can say—except, perhaps, to express my personal rage and utter frustration that in this land of opportunities and in the 1970's, I must do what has to be done to Charlene Westerville because we, as humans have so utterly failed her.

As to Paul Westerville, I feel a rage of a much different nature. I see before me a man who is less than a man in the sense that he, with all of his native ability and intelligence, with a fine education, can victimize a small, passive wife with violent physical abuse and direct such violence to small babies as well. Compare his rearing to that of his wife. Taken into a caring home as an infant adoptee, he had all of the advantages of a good home where he was not locked in cellars and physically abused. He had the opportunity of a good education, including college, and yet, he chose to start abusing those who had given him their love, their resources and their guidance. From early teens, he abused a defenseless mother

and later the father. Not being satisfied with the utter disruption of the home, he took Charlene as his wife and brought her to despair as a victim of his sadistic streaks. It would be most comfortable to say that during his period of aggression that Paul Westerville was mentally ill. This would let us, as society, and him as an individual, off the hook, but that is not so. The experts say he is not mentally ill and therefore, he is capable of rational thought and can decide between that which is right and that which is wrong. He consistently chooses violence, which surely is the wrong.

While Charlene pleaded guilty as a result of the death of Christine, the facts show that Paul Westerville was living in the home at that time and did nothing to prevent that death. The facts show that he was living in the home at the time of the death of John and did absolutely nothing to prevent his death from malnutrition and pneumonia.

The facts also show that every time Paul Westerville is frustrated in any way, much like a small child, he has violent outbursts in the nature of the traditional tantrums of small children. This man demonstrated this in his teens and continues as late as the past six months when he severely assaulted his victim-wife.

Here is a man who has a degree in social work and should have an understanding of the family and the care and support that a family needs. He has utterly failed in that responsibility and has, although a rational person, perpetrated the destruction of his wife emotionally and the destruction of two babies.

To further evaluate this man beggars description and defies my interpretation of human spirit. I can only conclude that he is not and will not be of the substance of which fathers are made. Fathers build—he tears down. Fathers guide their children— he abuses them. Fathers provide food and support—he lets them starve. Fathers love—he hates if frustrated.

From all of the testimony and from all of the evidence, I must do that which I am sworn to do as a Judge of the Juvenile Court. I must protect those children who come before the Court and see that justice is done to them. For Joseph and Catherine Westerville, there is nothing I can do to protect them from parents who have destroyed two of their brothers and sisters and who would, in my opinion, destroy them as well, if returned to them in a moment of stress or a period of frustration, but to terminate their parental rights.

This is a drastic action and one not easily taken, but this Court would be failing in its duty and its promise to these two helpless children who need the protection of which Justice Cooley spoke. This Court must grant these two living children their lives and their safety. They shall have the opportunity to grow and develop without knowing abuse and hunger and fear and violence.

The only satisfaction this Court has from this decision is that, perhaps, two more children have been saved from a life which has been epitomized in this case by the life of Charlene Westerville who sits before this Court today because twenty-five years ago, no Court was given the duty and opportunity to grant her a reprieve from that life.

ORDER

THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED that pursuant to M.C.L.A. Sec. 712.A2(b)(1) & (2), it is found that the parents, when able to do so, have utterly failed and neglected to provide proper medical care, proper support and who have deprived their children of emotional wellbeing for Joseph Westerville and Catherine (a/k/a Christine) Louise Westerville; and further, said parents, because of criminality, cruelty, and depravity, cannot provide a fit home for said Joseph Westerville and Catherine Westerville, to live.

IT IS FURTHER ORDERED AND ADJUDGED that the parental rights of Paul Westerville and Charlene Westerville, in and to Catherine (a/k/a Christine) Louise Westerville, and Joseph Westerville, be and they are, hereby terminated forthwith, pursuant to the provisions of M.C.L.A. § 712.-A19a(d) & (e); said minors to be forthwith

placed in the permanent custody of the Court.

IT IS FURTHER ORDERED that said minors shall not be placed for adoption within ninety (90) days from date hereof, pursuant to M.C.L.A. § 712.A21 providing for the petition for rehearing.

IT IS FURTHER ORDERED that no visitation rights shall be exercised by Paul Westerville and Charlene Westerville with the subject minor children of this action.

THIS ORDER TO CONTINUE until further Order of the Court.

(s) Charles W. Simon, Jr.
HONORABLE CHARLES W. SIMON, JR.
JUDGE OF PROBATE
FOR MONTCALM COUNTY
ACTING IN THE COUNTY OF KALAMAZOO